NILAVAR, Appellant and Cross–Appellee,

v.

OSBORN et al., Appellees and Cross–Appellants.

[Cite as *Nilavar v. Osborn* (2000), 137 Ohio App.3d 469.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 99–CA–53.

Decided April 7, 2000.

470

*David M. Rickert* and *Christine M. Haaker,* for appellant and cross–appellee.

*J. Kevin Cogan, Shawn J. Organ* and *Brian G. Selden,* for appellee and cross–appellant.

FAIN, Judge.

Plaintiff-appellant, Sundar V. Nilavar, M.D., appeals from a judgment awarding him $100,000 on his breach of contract claim against defendants-appellees, Robin E. Osborn, D.O., and Diagnostic Imaging Associates of Ohio, Inc. ("DIA"). Nilavar contends that the trial court erred by (1) denying his motions to compel discovery of financial information from Osborn and DIA, (2) instructing the jury that it had to find that Nilavar had established the elements of a joint venture in order to find in Nilavar's favor with respect to his breach of fiduciary duty claim, and (3) directing a verdict in favor of Osborn and DIA on Nilavar's claims for punitive damages, attorney fees, and emotional injury.

Cross-appellants Osborn and DIA appeal from the same judgment, arguing that the trial court erred by (1) overruling their motion for a directed verdict with respect to Nilavar's breach of contract claim, because Nilavar failed to present evidence that a "meeting of the minds" or an exchange of consideration occurred between Osborn and Nilavar, (2) instructing the jury that a contract may be formed by a party's "failure to act," standing alone, and (3) permitting Nilavar's expert witness to testify about Nilavar's alleged lost profits, and instructing the jury that it could award as damages Nilavar's "anticipated income." Osborn and DIA further argue that the jury's verdict in favor of Nilavar on his breach of contract claim is against the manifest weight of the evidence because Nilavar failed to present evidence that a meeting of the minds or an exchange of consideration occurred between Osborn and Nilavar. In the alternative, Osborn and DIA argue that the jury's award of $100,000 to Nilavar on his breach of contract claim is against the manifest weight of the evidence, generally.

Regarding the issues raised in Osborn's cross-appeal, we conclude that the trial court did not err by overruling Osborn's motion for a directed verdict with respect to Nilavar's breach of contract claim, nor was the jury's verdict awarding Nilavar $100,000 on that claim against the manifest weight of the evidence. We also conclude that the trial court did not err by instructing the jury that assent may be manifested by, among other things, a party's failure to act. We further conclude that the trial court did not err in instructing the jury that it could award Nilavar his "anticipated income," as damages stemming from Osborn's breach of contract.

Regarding the issues raised in Nilavar's appeal, we conclude that the trial court did not err in directing a verdict against Nilavar with respect to his claim for punitive damages, since his claim for breach of fiduciary duty has not been

recognized as an independent tort in this state. We also conclude, however, that the trial court did abuse its discretion by overruling Nilavar's motion to compel production of financial records from Osborn and DIA. Accordingly, the judgment of the trial court is *affirmed in part* and *reversed in part,* and this cause is *remanded* for a new trial, limited to the issue of the proper amount of damages that Nilavar should be awarded as a result of Osborn's breach of contract.

I

Springfield Radiologists, Inc. ("SRI") was a close corporation in which the shareholders were physicians providing radiology services to several hospitals in Clark County, to wit, Mercy Medical Center and Mercy Memorial Hospital in Springfield and Urbana, respectively, and Community Hospital in Springfield.

Nilavar became an employee of SRI in 1976, and a shareholder in the corporation in 1980. Osborn became an employee of SRI in 1991 and a shareholder in 1993. Upon becoming a shareholder, Osborn, like all other shareholders at SRI, signed an employment agreement containing a noncompetition clause.

Prior to 1991, SRI radiologists had practiced at the Mercy hospitals without a contract. In January 1991, SRI's founder and president, Dr. Stanley Nedelman, entered into negotiations with Mercy toward the end of making SRI the exclusive provider of radiology services for the Mercy hospitals. Some time after he had become a shareholder in SRI, Osborn was selected by SRI's other shareholders to join Nedelman in conducting the negotiations with Mercy. In 1994, Nedelman and Osborn reached a tentative agreement with Mercy. However, when they submitted the agreement to SRI's shareholders for their approval, the shareholders rejected it, and submitted a counterproposal. Mercy, in turn, rejected the counterproposal. Consequently, the negotiations between the parties broke down.

In April 1995, Mercy issued a request for proposals, permitting any provider of radiology services to submit an offer to provide services at the Mercy hospitals. Mercy made clear in its request for proposals that it wanted its provider to furnish services exclusively at Mercy—not to Community Hospital, which it considered to be a competitor—and that it wanted its provider to have a "strong medical director." The latter requirement came in response to Mercy's belief that SRI had been "too democratic,"[1] thereby disabling it from reaching a

---

1. For instance, one of the issues that caused Mercy to demand that any group wishing to submit a bid in response to Mercy's request for proposals have a strong medical director concerned the use of ionic or nonionic contrast dye for injection into patients in order to take x-rays. The nonionic dye was considerably safer for the patient, but also considerably more

consensus on key issues. The request for proposals set June 16, 1995, as the deadline for receiving all bids.

Around the time Mercy issued the request for proposals, Osborn began to organize DIA, a corporation in which Osborn was the sole shareholder. Osborn intended for DIA to submit a proposal to Mercy to be its radiology services provider. Osborn contacted two other SRI shareholders, Drs. Bruce MacLean and Jerald Brinley, who agreed to work for DIA if Mercy accepted its bid. All three doctors agreed not to discuss their plans with the other SRI shareholders.

After receiving a copy of the request for proposals, Nedelman called an emergency board meeting of SRI, which took place on May 18, 1995. This May 18 meeting became the pivotal event in the current controversy.

At the time of the May 18 meeting, SRI was comprised of eleven physicians. In addition to Nedelman, Nilavar, Osborn, MacLean, and Brinley, SRI included Drs. David Lawrence, David Davis, Rick Kukulka, Barney Willens, Martin Morin, and Salvador Trinidad. All but Davis were shareholders in the corporation. Six of the eleven physicians, Nilavar, Osborn, MacLean, Brinley, Lawrence, and Davis, worked primarily at the Mercy hospitals, while the remaining five worked primarily at Community Hospital. All eleven physicians testified at Nilavar's subsequent lawsuit against Osborn, either in person or by deposition. Although each of the eleven accounts differs to a varying extent, with the exception of Osborn's, Brinley's, and MacLean's testimony, they generally corroborate Nilavar's version of events.

According to Nilavar and his witnesses, Nedelman began the May 18 meeting by stating that it had become apparent to him that SRI, as it was presently constituted, was not going to be able to submit an acceptable bid in response to Mercy's request for proposals, and that, therefore, "in order to preserve the eleven jobs," SRI should be dissolved, and two new groups created. Nedelman proposed that Osborn would lead the group of six physicians who practiced primarily at the Mercy hospitals, and that Kukulka would lead the remainder, who practiced primarily at Community Hospital. According to Nilavar and some, but not all of his witnesses, Osborn nodded in affirmation when Nedelman proposed that he lead the Mercy group of physicians in submitting a proposal acceptable to Mercy. Nedelman then permitted each of the remaining physicians to express their opinion on his proposal to dissolve SRI and form two new groups. All persons who were present at the meeting and who were not connected with

---

expensive. Nilavar and others at SRI wanted to use the nonionic contrast dye—especially since Mercy would not agree to indemnify the physicians in any potential, future malpractice action. This was one of the issues that led to the breakdown in negotiations between Mercy and SRI. Mercy wanted to deal with a group that had a strong medical director who could make a final decision for the group on these kinds of issues that would be uniformly followed.

DIA testified that no one expressed any opposition to Nedelman's proposal, and that support for the proposal was unanimous.

At the close of the meeting, MacLean made a motion to dissolve SRI, Willens seconded it, and the motion was adopted unanimously. Several of Nilavar's witnesses, including Lawrence, Davis, Morins, Willens, and Trinidad, viewed the vote on the motion to dissolve SRI as implicitly including a vote on Nedelman's proposal to form two new groups.

Osborn countered the testimony of Nilavar and his witnesses by asserting that Nedelman's statement was nothing more than a "laundry list of wishes," which was never presented as a formal plan or proposal. Osborn denied that Nedelman tasked him with leading the "Mercy group" of radiologists, and insisted that the motion made by MacLean was a motion to dissolve SRI and nothing more. Osborn also denied having ever nodded "yes" to Nedelman's alleged proposal, insisting that he "is not a 'wink and nod' type of guy." Osborn's testimony was corroborated by Brinley, and to some extent by MacLean, who admitted that, aside from the discussion concerning the vote to dissolve SRI, he "tuned out" much of the remaining discussion at the meeting.

The minutes of the May 18th meeting were recorded by Willens, the corporate secretary of SRI. Those minutes stated as follows:

"[Nedelman] described the current environment around SRI and [Mercy]. His summary was thought to be accurate by all. [Nedelman's] opinion is that the best way for us to maintain eleven jobs in Springfield may be to dissolve SRI and to restructure as two separate radiology groups. This would make a proposal [Osborn] submits to [Mercy] on par with out-of-town proposals vis-a-vis [Mercy] having control of its 'own' Radiology Department. All Radiologists were given an opportunity to speak their piece about this.

"[MacLean] moved to dissolve SRI as an Ohio corporation effective as soon as is practical. [Willens] seconded this. Motion passed unanimously.

"[Nilavar] pointed out many practical problems to overcome with this. Nedelman and Osborn were tasked to choose attorneys to guide us through this process of forming two new entities. This to proceed expeditiously."

Willens admitted that the minutes he recorded of the May 18 meeting do not reflect that Osborn was tasked with leading the Mercy group of radiologists; however, Willens insisted that the event occurred nonetheless. Specifically, Willens testified that after Nedelman charged Osborn with the task of developing a proposal on behalf of the Mercy group and submitting it to Mercy, Nedelman asked Osborn something to the effect, "Do you understand that this is what you're to do," and Osborn responded by nodding "yes."

According to Nilavar's testimony, when he asked Osborn, shortly after the May 18 meeting, "[h]ow are you going to conduct the new group[,] [w]ill it be a fat cat situation," Osborn responded by saying, "[n]o, no, no, no. We will all be equals." When Nilavar asked Osborn to allow him to see the proposal, Osborn told Nilavar that he needed to check with his attorney.

On May 25, 1995, SRI held another shareholder meeting. The minutes from the meeting state that "[Osborn] indicates he has already contacted an attorney to begin forming one of the two new entities." These minutes were later approved at a subsequent shareholder meeting attended by Osborn. At trial, Osborn said that at the May 25 meeting Nedelman simply had asked him if he had seen an attorney, and he replied that he had.

Osborn testified that he told Nilavar shortly after the May 18 meeting that his position at Mercy was "limited" and that he should be looking for a new job. Osborn acknowledged that Nilavar did request to see the proposal, and that his first response to the request was that his "attorney probably wouldn't like that. I would have to check with him." However, Osborn testified that after he thought about it for "a second or two," he told Nilavar, "This is my proposal. I'm not going to show it to anybody; and if anybody else wants to put in a proposal of their own, they should do that."

In July 1995, Nilavar again asked Osborn about the status of the proposal. When Osborn told him that the other physicians in the group, himself included, were looking for jobs in other cities, Nilavar replied that he could not relocate and was depending on Osborn's bid. Osborn stated that if his proposal was rejected they would all be looking for work.

In late August 1995, Mercy accepted the proposal from DIA. On September 1, 1995, Osborn sent a letter to his colleagues at SRI, informing them that Mercy had accepted his bid and that only Brinley and MacLean would be joining him. Nilavar testified that he literally passed out when he saw the letter. Nilavar became mentally depressed over the episode and subsequently sought psychiatric treatment. On September 28, 1995, Nilavar sent a letter to SRI's Board of Directors, informing them of his decision to use his vacation and sick leave until the end of December 1995. The September 28 letter made a cryptic reference to a "potential legal situation."

On October 3, 1995, Nedelman prepared an addendum to the May 18 meeting, which attempted to clarify what had happened at that event. The addendum essentially stated that division of SRI into two new entities was part of the plan of dissolution approved unanimously by the shareholders, and that Osborn had been chosen to lead the group of radiologists that practiced primarily at Mercy. The concluding paragraph of the addendum stated:

"I [Nedelman], in no uncertain terms, pointed out that with a group of five radiologists at Community Hospital there would be no additional openings there for any Mercy Medical Center radiologists wishing to join that group, either out of choice or because they might lose their position with the Mercy Medical Center group. It was my impression that this was understood and accepted."

All non-DIA physicians testified that the addendum was accurate. Davis qualified his remarks, however, by saying that he could not "remember specifically if [they] discussed the items in the [concluding] paragraph." Osborn and his witnesses testified that the addendum was inaccurate and contained certain fabrications.

SRI dissolved in December 1995, and DIA took over providing radiology services at the Mercy hospitals. In May 1996, Nilavar filed a complaint against Osborn and DIA, alleging breach of contract, promissory estoppel, fraud, and breach of fiduciary duty. In March 1997, Osborn and DIA moved for summary judgment with respect to all of Nilavar's claims. In August 1997, the trial court granted summary judgment in favor of Osborn and DIA on all claims. Nilavar appealed.

In *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1, 711 N.E.2d 726, we affirmed the trial court's grant of summary judgment in favor of DIA, reversed the summary judgment granted in favor of Osborn, and remanded the cause for further proceedings. Nilavar subsequently filed an application for reconsideration of our affirmance of the trial court's grant of summary judgment in favor of DIA. On May 12, 1998, this court issued a decision and entry granting Nilavar's application for reconsideration, reversing the trial court's grant of summary judgment in favor of DIA with respect to Nilavar's fraud claim, but affirming the grant of summary judgment in favor of DIA with respect to Nilavar's remaining claims.

Nilavar's claims against Osborn and DIA were tried before a jury from June 1, 1999 to June 10, 1999. The jury found in favor of Nilavar with respect to his breach of contract claim and awarded him $100,000 in compensatory damages. The jury found against Nilavar with respect to his remaining claims.

Nilavar appeals from the judgment of the trial court. Osborn cross-appeals.

## II

Osborn's First and Second Assignments of Error on cross-appeal state as follows:

"The trial court should have granted Dr. Osborn's motion for a directed verdict on plaintiff's contract claim because plaintiff failed to produce any evidence of a meeting of the minds or consideration for Dr. Osborn's alleged promise.

"The verdict in plaintiff's favor on his claim for breach of contract is against the manifest weight of the evidence because there was no evidence that a meeting of the minds or an exchange of consideration occurred between plaintiff and Dr. Osborn."

Osborn argues that the trial court erred by overruling his motion for a directed verdict regarding Nilavar's breach of contract claim, and that the jury's verdict in favor of Nilavar with respect to his breach of contract claim is against the manifest weight of the evidence because Nilavar failed to establish all of the essential elements of a contract. We disagree.

A motion for directed verdict tests whether the evidence presented is legally sufficient to warrant submitting the case to the jury. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, 255–256, quoting *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469. " '[I]f there is substantial competent evidence to support the party against whom the motion is made, upon which reasonable minds might reach different conclusions, the motion must be denied.' " *Wagner, supra,* quoting *Strother, supra.* Neither the weight of the evidence nor the credibility of the witnesses can be considered in determining a motion for a directed verdict. *Id.*

By contrast, in determining whether a jury's verdict is contrary to the manifest weight of the evidence, an appellate court does, to a limited extent, weigh the evidence and consider the credibility of the witnesses in order to ensure against a miscarriage of justice, keeping in mind, however, that those matters are primarily for the trier of the facts to decide in either a civil or criminal case. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Judgments "supported by some competent credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276.

"A contract is an agreement, upon sufficient consideration, between two or more persons to do or not to do a particular thing." *Lawler v. Burt* (1857), 7 Ohio St. 340, 350, 1857 WL 52. The Restatement of the Law 2d, Contracts (1981) 5, Section 1, defines a "contract" as "[a] promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."

To prove a breach of contract claim, a plaintiff must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649

N.E.2d 42, 44. To prove the existence of a contract, a plaintiff must show that both parties consented to the terms of the contract, that there was a "meeting of the minds" of both parties, and that the terms of the contract are definite and certain. *McSweeney v. Jackson* (1996), 117 Ohio App.3d 623, 631, 691 N.E.2d 303, 308.

Initially, Osborn argues that Nilavar failed to establish that a "meeting of the minds" took place between the parties to the alleged contract, because the evidence submitted demonstrates that (1) the parties never communicated with one another, (2) he (Osborn) never manifested his assent to Nedelman's proposal that he lead the "Mercy" group of radiologists by developing and submitting a proposal to Mercy, and (3) Nilavar failed to identify what the specific proposition was to which he (Osborn) allegedly manifested his assent. We disagree.

"[A]n express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound." *Id.*, 117 Ohio App.3d at 631, 691 N.E.2d at 308. The parties' consent or "mutual assent" to the terms of a contract is normally manifested by an offer and acceptance. "Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance." *Id.*, citing *Restatement of the Law 2d, Contracts* (1981) 53, Section 18. "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act." *Id.*, citing Restatement of the Law 2d, Contracts (1981) 55, Section 19(1).

Here, Nilavar and several of his witnesses testified that Osborn nodded his head "yes" when Nedelman proposed at the May 18 meeting that Osborn lead the Mercy group of radiologist in submitting a proposal to Mercy. According to Willens, when Nedelman charged Osborn with the task of developing a proposal and submitting it on behalf of the Mercy group of physicians, Nedelman asked Osborn something to the effect, "Do you understand that this is what you're to do?[,]" and Osborn responded by nodding his head "yes."

Furthermore, according to the minutes of the May 25 meeting of the SRI shareholders, which was introduced into evidence as Joint Exhibit 18, Osborn told the group that he had "already contacted an attorney to begin forming one of the two new entities." This corroborated the testimony of Nilavar and his witnesses that Osborn had assented to leading the Mercy group in submitting a bid in response to Mercy's request for proposals.

Additionally, it is undisputed that Osborn never expressed any opposition to Nedelman's proposal at the May 18 meeting. One of the physicians who testified on Nilavar's behalf, Trinidad, stated that it was Osborn's failure to express any opposition to Nedelman's proposal that led him to believe that Osborn had agreed

to it. Given the fact that Osborn, along with Nedelman, had handled SRI's negotiation with Mercy, it was reasonable for Trinidad to assume that Osborn's silence on the matter meant that he accepted the task of leading the Mercy group in submitting a competitive bid to Mercy.

Osborn asserts that during his trial testimony, Nilavar himself equivocated on the issue of whether there actually was a head nod, by testifying that he "thought" Osborn had done so. In fact, when asked how Osborn responded to Nedelman's proposal, Nilavar responded, "I don't think he [Osborn] spoke up, but he didn't speak anything; but I think he nodded his head." However, on subsequent occasions during his testimony Nilavar simply said that Osborn nodded "yes" in response to Nedelman's proposal. Furthermore, several of Nilavar's witnesses testified that Osborn nodded affirmatively to Nedelman's proposal, including Willens, as outlined above. It was up to the jury to decide what weight, if any, to accord to Nilavar's initial use of the words "I think he nodded his head." The same is true for the fact that some of Nilavar's witnesses, like Nedelman and Trinidad, could not remember if Osborn nodded his head.

Moreover, the evidence presented allowed the jury to find that the specific proposition to which Osborn assented was that SRI would be dissolved and restructured into two new entities, one of which would be led by Osborn, who was charged with developing and submitting a proposal on behalf of the Mercy group of radiologists.

■■■ Osborn also argues that there was no valid contract in this case because he never received any consideration for his alleged promise. Again, we disagree.

■■■■■ "Consideration may consist of either a detriment to the promisee or a benefit to the promisor." *Brads v. First Baptist Church* (1993), 89 Ohio App.3d 328, 336, 624 N.E.2d 737, 743. "A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss or responsibility given, suffered or undertaken by the promisee." *Id.* "[T]he benefit or detriment must be something intended by the parties as such; it cannot be something merely incidental to the contract." *Nilavar*, 127 Ohio App.3d at 15, 711 N.E.2d at 735, citing 17 Ohio Jurisprudence 3d (1980) 486–487, Contracts, Section 54. Additionally, "[a]bsent a showing of fraud, consideration is not deemed legally insufficient merely because it is inadequate." *Brads*, 89 Ohio App.3d at 336, 624 N.E.2d at 743. See, also, *Ford v. Tandy Transp., Inc.* (1993), 86 Ohio App.3d 364, 384, 620 N.E.2d 996, 1009 (once consideration is shown, court generally will not inquire into its adequacy).

As we stated in *Nilavar, supra,* the existence of consideration given in exchange for Osborn's promise can be "easily inferred" given the nature of the parties' agreement:

"The oral contract that Nilavar claims existed bound the Mercy doctors in a joined effort to continue their employment. The natural inference of consideration given in such a contract is the cooperation of each participant. Each doctor would make his services available as part of the offer to the hospital, each person would be ready if the offer were accepted, and each would refrain from entering a competing bid. Each promisor offered the benefit of his cooperation and refrained from independently pursuing his own ends." *Id.* at 15, 711 N.E.2d at 735.

Osborn argues that the consideration outlined above is "illusory" because: (1) including Nilavar's name in the proposal would have hurt, rather than helped, Osborn to win the bid, and (2) any competing bid from Nilavar would not have been taken seriously by Mercy's selection committee, according to Nilavar's own witnesses, Lawrence and Nedelman, respectively. However, these arguments focus on the adequacy of the consideration given, and, therefore, do not render it insufficient. *Brads, supra.*

Additionally, Osborn had been informed by his attorney that because of the noncompetition provision in his shareholder agreement with SRI, there would have to be a vote to dissolve SRI before he could submit any proposal to Mercy in response to its request for proposals. Thus, the votes of Nilavar and his colleagues to dissolve SRI provided a valuable consideration for Osborn's promise to lead the Mercy group.

Osborn disputes this conclusion on the grounds that only seven votes were needed to dissolve SRI, see R.C. 1701.86(E), and he had a "lock" on eight votes, to wit, his, Brinley's, and MacLean's, as well as the votes from the five SRI radiologists who worked primarily at Community Hospital. In support of his argument, Osborn points to the testimony of Kukulka and Nedelman, who testified that the Community group of radiologists had met prior to the May 18 meeting, agreeing among themselves to vote to dissolve SRI. Therefore, Osborn argues, Nilavar's vote had no "independent value."

However, the Community group of radiologists, who all testified on Nilavar's behalf, actually cast their vote to dissolve SRI with the understanding that Osborn would submit a proposal to Mercy on behalf of all of the radiologists in the Mercy group. If, at the May 18 meeting, Osborn had refused to go along with Nedelman's proposal that he lead the Mercy group of radiologists in developing and submitting a bid to Mercy, the five radiologists in the Community group could have withheld their votes to dissolve SRI, using them as leverage in order to force Osborn to agree to include all of the radiologists in the Mercy group in his proposal.

We also disagree with Osborn's argument that Nilavar's vote to dissolve SRI could not serve as consideration for his promise to lead the Mercy group, since he

"never asked for Osborn's vote and Nilavar never promised it." As noted above, evidence was presented to demonstrate that Osborn assented to Nedelman's proposal that SRI be dissolved, and that two new entities be created to take its place, with Osborn in charge of one of them. In order to carry out the task which he accepted, he needed to procure the votes of at least seven of the ten SRI shareholders. Furthermore, Nilavar indicated his assent to the proposal by rendering part of his performance by voting to dissolve SRI. See *McSweeney*, 117 Ohio App.3d 623, 691 N.E.2d 303.

Osborn also contends that Nilavar failed to identify the "essential terms" of the alleged contract because he failed to identify the parties to the contract or its subject matter. Once again, we disagree.

In a contract other than for the sale of goods, the "essential terms" of the contract generally are the parties to the contract and its subject matter. *Nilavar*, 127 Ohio App.3d at 13, 711 N.E.2d at 733–734, citing 17 Ohio Jurisprudence 3d (1980) 446, Contracts, Section 17; see, also, *Alligood v. Procter & Gamble Co.* (1991), 72 Ohio App.3d 309, 311, 594 N.E.2d 668, 668–669. When the terms of a contract are not sufficiently definite, the contract is unenforceable. *Isquick v. Classic Autoworks, Inc.* (1993), 89 Ohio App.3d 767, 772, 627 N.E.2d 624, 627–628. The terms of a contract are sufficiently certain or definite where they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Mr. Mark Corp. v. Rush, Inc.* (1983), 11 Ohio App.3d 167, 169, 11 OBR 259, 261, 464 N.E.2d 586, 589, quoting Restatement of the Law 2d, Contracts (1981) 92, Section 33. Furthermore, " '[a]n offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary. * * * Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract.' " *Mr. Mark Corp., supra,* at 169, 11 OBR at 262, 464 N.E.2d at 590, quoting Restatement of the Law 2d, Contracts (1981) 95, Section 33, Comment *f.*

Here, Nilavar's evidence demonstrated that Osborn agreed to act on behalf of the other shareholders who worked at Mercy. Thus, the evidence shows that the parties to the contract were identified with sufficient clarity to support a breach of contract claim. Furthermore, Osborn had sufficient information to know what his specific contractual duties would entail. The main objective of the May 18 meeting was to preserve the eleven jobs of the members of SRI. Therefore, Osborn was aware, that as leader of the Mercy group, it was his duty to develop and submit a proposal on their behalf. Furthermore, Osborn, along with Nedelman, had led SRI's earlier negotiations with Mercy. Osborn was also

aware of Mercy's request for proposals, which essentially listed a series of demands that the successful bidder would have to meet. Consequently, the subject matter of the contract was sufficiently certain to determine the existence of a breach.

Given the foregoing, the trial court did not err in overruling Osborn's motion for a directed verdict, and the jury's verdict was not against the manifest weight of the evidence.

Osborn's First and Second Assignments of Error on cross-appeal are overruled.

III

Osborn's Third Assignment of Error on cross-appeal states:

"The trial court erred when it instructed the jury that a contract may be formed by a party's 'failure to act.'"

Osborn contends that the trial court erred by instructing the jury that "[a]ssent may be manifested fully or partially by written or spoken words or by other acts or by the failure to act," because the instruction allowed the jury to conclude that it could return a verdict in Nilavar's favor on his breach of contract claim based *solely* on Osborn's alleged "failure to act," a phrase that Osborn interprets to include remaining silent, which would include his decision to remain silent at the May 18 meeting with respect to Nedelman's proposal. Osborn argues that his silence at the May 18 meeting could not have signaled his assent unless he had a duty to speak, and Nilavar failed to demonstrate that he had such a duty.

Generally, silence in response to an offer will not constitute an acceptance of the offer. *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.* (1978), 54 Ohio St.2d 147, 152, 8 O.O.3d 149, 151–152, 375 N.E.2d 410, 413–414. Where the relationship between the parties justifies an expectation of a reply, however, silence in response to the offer may constitute an acceptance. *Id.*

Here, the relationship between the parties as of the May 18 meeting justified the expectation of a reply from Osborn if he did *not* agree to act on behalf of the Mercy group of radiologists, given the fact that Osborn had acted as SRI's agent in negotiating with Mercy on SRI's behalf since 1993.

Osborn asserts that the instruction given fails to capture the principle that silence can constitute an acceptance where the relationship between the parties justifies an expectation of a reply. We disagree. The trial court's instruction, in context, was as follows:

"The first essential element of the plaintiff's breach of contract claim is the meeting of the minds. To be binding, both parties must agree to a contract so

that there is a manifestation of their mutual assent to the terms and conditions of the contract, * * *.

"There can be no contract if only one party expresses an intention to be bound or if the parties do not agree on the essential terms of their agreement.

"The meeting of the minds or the mutual manifestation of intent may be fully or partly by written or spoken words or by other acts or conduct. Assent may be manifested fully or partially by written or spoken words or by other acts or by the failure to act."

Pursuant to the instruction given, the jury could find that Osborn's "failure to act," or silence, constituted an acceptance of Nedelman's proposal only if his silence constituted a manifestation of his assent to its terms, or an expression of his intention to be bound. Therefore, if the jury did reject Nilavar's claim that Osborn nodded his head in response to Nedelman's proposal, and found, instead, that Osborn simply remained silent, it still had to find that Osborn's silence amounted to an expression of Osborn's intention to be bound by the terms of proposal, in order to find in Nilavar's favor. The jury could have made this finding only if it believed that the circumstances justified a finding that Osborn's silence was reasonably viewed by his fellow SRI shareholders as an expression of his agreement to the terms of Nedelman's proposal. Accordingly, we find no error in the instruction given.

Osborn's Third Assignment of Error on cross-appeal is overruled.

## IV

Osborn's Fourth Assignment of Error on cross-appeal states:

"The trial court erred when it permitted Alan Duvall, plaintiff's 'expert,' to testify regarding plaintiff's alleged lost profits and when it instructed the jury that it could award as damages plaintiff's 'anticipated income.' "

Osborn argues that the trial court erred by (1) allowing Nilavar's expert, Alan Duvall, to testify about calculations of damages based on the "Gamboa" actuarial charts or work life expectancy tables ("the Gamboa study"), which Osborn contends are unreliable, and (2) instructing the jury that it could award damages to Nilavar based on Nilavar's "anticipated income." We find both arguments unpersuasive.

## A

Osborn argues that the trial court should have ruled Duvall's expert testimony based upon the Gamboa study inadmissible pursuant to Evid.R. 701 and 703. Osborn asserts that in order for an expert's testimony to be admissible at trial,

the expert's testimony must be "helpful" to the jury, pursuant to Evid.R. 701. Citing Evid.R. 703, Osborn further asserts that "as a matter of law, an expert's testimony can be "helpful" only if it is based on facts and data "perceived by him or admitted into evidence at the hearing." Noting that Duvall prepared his damages calculations based upon actuarial charts prepared by A.M. Gamboa that identify work life expectancy based upon an individual's disability status, Osborn contends that the trial court should have ruled Duvall's testimony inadmissible because there was no evidence that Duvall "perceived" the data underlying the Gamboa study, and the data was not admitted into evidence. We disagree.

Initially, Evid.R. 701 has no application to the issue of the admissibility of Duvall's expert testimony because it applies only to the opinion testimony of *lay witnesses*, not *experts*.[2] Furthermore, Evid.R. 703 has no application to the issue of whether the Gamboa study is sufficiently reliable to allow Duvall to base his opinion on it. Evid.R. 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." The "facts or data" referred to in Evid.R. 703, refers to the facts and data "in the particular case," and not to the facts and data underlying the "scientific, technical, or other specialized information"[3] that the expert relies upon in forming his opinion. The rule allows an expert to base his opinion upon facts or data in the particular case that have been (1) "perceived" by the expert, meaning those facts or data of which the expert has first-hand knowledge, or (2) "admitted in evidence," meaning those facts or data that have been introduced into evidence at trial, prior to the point at which the expert is called to the witness stand. An example of facts or data in a particular case having been "perceived" by an expert witness, without those facts having been first submitted into evidence, would be where the plaintiff's expert witness is also the plaintiff's treating physician. See 1 Weissenberger Ohio Evidence (1995) 12, Section 703.2.

The rule governing the question of whether the Gamboa study provides a sufficiently reliable basis for Duvall's testimony is Evid.R. 702, which requires, among other things, that the expert's testimony be based upon "reliable scientific, technical, or other specialized information." However, at trial and on appeal,

---

2. Evid.R. 701, entitled "Opinion Testimony by Lay Witnesses," provides that "[i]f the witness is *not* testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." (Emphasis added.)

3. Evid.R. 702(C).

Osborn's argument that Duvall's testimony should be deemed inadmissible because of the unreliability of the Gamboa study has been centered, largely, around Evid.R. 703. Osborn has not cited Evid.R. 702 at trial or on appeal in support of his argument. By failing to argue that Duvall's testimony was inadmissible pursuant to the standard set forth in Evid.R. 702, Osborn has waived all but plain error with respect to this issue. See Evid.R. 103(A)(1) and (D).

Evid.R. 702 provides:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

Here, there is no question that Duvall's testimony was a fit subject for expert testimony, since it related to matters beyond the ken of the average layperson. Nor is there any question that Duvall was qualified as an expert witness. The question remaining is whether Duvall's expert testimony meets the third condition for admissibility under Evid.R. 702, namely, whether it was based on *reliable* scientific, technical, or other specialized information.

As a threshold matter, while the Gamboa study may not qualify as "scientific information," it does fall under the category of either "technical" or "other specialized information." See, generally, *State ex rel. Montgomery v. Trauth Dairy* (S.D.Ohio 1996), 925 F.Supp. 1247, 1252 (pursuant to Fed.R.Evid. 702, expert economic testimony may not fall within category of "scientific knowledge," but does fall under the category of "technical or other specialized knowledge"). In *State v. Stowers* (1998), 81 Ohio St.3d 260, 690 N.E.2d 881, the Ohio Supreme Court ruled that if an expert's testimony is based on "specialized information"

that "does not involve scientific or technical testing or procedures," then "the further requirements listed in Evid.R. 702(C)(1) to (3) are not at issue." Nevertheless, *Stowers* involved the expert testimony of a psychologist who opined that the behavior of several children who, allegedly, had been sexually abused by their father was consistent with the behavior of children who, in fact, had been sexually abused. Duvall's expert testimony, on the other hand, pertains to economic theory, and, therefore, is more conducive to the kind of analysis outlined in Evid.R. 702(C)(1) to (3). Therefore, in order for the Gamboa study to be considered "reliable" for purposes of Evid.R. 702(C), it must meet the three requirements listed in Evid.R. 702(C)(1) to (3).

First, the Gamboa study must be "objectively verifiable" or "validly derived from widely accepted knowledge, facts, or principles." Evid.R. 702(C)(1). The "objectively verifiable" language codifies the approach adopted by the Ohio Supreme Court in *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, and *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, and the approach adopted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Giannelli, Snyder, Evidence (1996) 668 (1999 Supp., 185), Section 702.9. A theory is considered "widely accepted" if it is propounded by at least a substantial minority of experts in the relevant field. *Id.*

Initially, Nilavar failed to present sufficient evidence to show that the Gamboa study was "widely accepted." Duvall testified that he had used it in his testimony in other cases in which he had been called to provide expert testimony, and that other experts he knew had used it in their testimony. However, this testimony is insufficient to demonstrate that the Gamboa study is propounded by a substantial minority of experts in the field of economic damages.

With respect to the "objectively verifiable" standard, in *Williams, supra,* and *Pierce, supra,* the Ohio Supreme Court adopted a "relevancy standard" for determining the admissibility of scientific, technical, or other specialized evidence, which considers, "whether the questioned evidence is relevant and will assist the trier of fact in understanding evidence presented or in determining a fact in issue." *Id.* at 496–497, 597 N.E.2d at 112. In *Daubert, supra,* the United States Supreme Court adopted a "reliability standard" for determining the admissibility of scientific evidence, which considers "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–593, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. Factors that a court should consider in making this determination include, but are not limited to, (1) whether the theory can be tested, (2) whether the theory or technique has been subject to peer review and publication, (3) the known or potential rate of error and standards

controlling the technique's operations, and (4) whether the theory or technique has been generally accepted by the scientific community. Although *Daubert* specifically dealt with scientific evidence, its analytical framework has been used to analyze nonscientific expert testimony. Nevertheless, courts should keep in mind that "the *Daubert* factors * * * were devised specifically for scientific testimony [and, therefore,] the *Daubert* analysis should be modified in the case of social science or other non-scientific expertise." *Trauth Dairy, supra,* 925 F.Supp. at 1252.

Applying the standard set forth in *Williams* and *Pierce,* we conclude that Duvall's testimony based upon the Gamboa study was relevant and could assist the trier of facts in understanding the evidence presented or in determining a fact in issue, to wit: the amount of damages suffered by Nilavar due to Osborn's breach of contract. Applying the factors set forth in *Daubert,* we note that while there was no evidence that the Gamboa study had been subjected to peer review[4] or had been generally accepted by the scientific community, these factors are not prerequisites to admissibility under *Daubert.* See *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 612–613, 687 N.E.2d at 740–741. It has been held that regression analyses like the Gamboa study "are generally considered reliable disciplines." *Trauth Dairy, supra,* 925 F.Supp. at 1252. The Gamboa study was based on data from the Current Population Survey by the U.S. Department of Commerce, Bureau of Census. The Gamboa study had been published for at least nine years at the time of trial, and Duvall knew of other experts who relied on it. Duvall also testified that if he had based his damage calculations on the "Cieka Study," which Osborn's expert recognized as authoritative, his calculations would have been even higher. Duvall utilized the more conservative study.

With respect to the last two requirements for reliability listed in Evid.R. 702(C)(2) and (3), we conclude that, given Duvall's expert qualifications, the trial court could have reasonably found that Duvall implemented the theory behind the Gamboa actuarial charts reliably, and that Duvall conducted an analysis using the Gamboa work life expectancy tables in a manner likely to yield an accurate result.

Given the foregoing, we find no abuse of discretion in the trial court's decision to admit Duvall's expert testimony.

---

4. Nilavar did provide the trial court with a copy of an order from a federal district court, denying a defendant's motion *in limine* to have expert testimony, which, according to Nilavar, was based on the Gamboa study, ruled inadmissible. In its order, the trial court noted, among other things, that the study had been subject to peer review. However, the decision, *Woods v. Elgin, Joliet & E. Ry. Co.* (Dec. 11, 1998), N.D.Ill. No. 96 C 6819, unreported, does not expressly state that the study being discussed therein is the Gamboa study. Therefore, the relevance of the *Woods* decision is problematic.

B

Osborn also argues that the trial court erred by instructing the jury that it could award damages to Nilavar with respect to his breach of contract claim based on Nilavar's "anticipated income" or lost profits. Osborn asserts that the only damages Nilavar was entitled to recover were those he may have suffered acting in reliance on the alleged promise. Osborn further asserts that these "reliance damages" were limited to either (1) Nilavar's loss resulting from not submitting a competing bid, or (2) the value bestowed upon Osborn as a result of reduced competition. Osborn concludes by arguing that Nilavar could not have suffered any reliance damages in this case because "it was undisputed" that Nilavar could not have submitted a competitive bid. We find Osborn's arguments unpersuasive.

Generally, a party who has suffered damages as a result of a breach of contract is entitled to his "expectation interest," or "his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement of the Law 2d, Contracts (1981) 102–103, Section 344. Generally, "lost profits may be recovered by the plaintiff in a breach of contract action if: [1] profits were within the contemplation of the parties at the time the contract was made, [2] the loss of profits is the probable result of the breach of contract, [3] and the profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 244, 12 OBR 322, 325, 466 N.E.2d 883, 887–888, citing 30 Ohio Jurisprudence 3d (1983) 100, Damages, Section 90.

Here, there was sufficient evidence submitted to allow the trial court to instruct the jury that it could award damages to Nilavar based on his anticipated income or lost profits. First, there was evidence submitted demonstrating that Mercy was interested in maintaining its relationship with SRI despite the impasse in negotiations that led to Mercy's decision to issue a request for proposals. Mercy had been doing business with SRI for almost a quarter of a century, and SRI was a known quantity. Mercy had offered SRI a contract as late as 1994, which SRI turned down, and Mercy did not issue its request for proposals until April 1995. Even when it issued its request for proposals, Mercy informed SRI that it could file a competing bid.

The shareholders at SRI knew that in order to win the bid, they had to drop their demands and accede to those made by Mercy in its request for proposals. Osborn's own witnesses like Michael Peterson, who was Mercy's chief executive officer at this time, acknowledged that the inclusion of Nilavar's name in the bid would not have killed DIA's bid, as Osborn asserts. These witnesses also acknowledged that Mercy did not have a list of certain physicians whom they did

not want included on the staff of their exclusive service provider. Persons who served on Mercy's selection committee for a radiology services provider acknowledged that the two other groups that submitted bids in response to the request for proposals did not even provide all of the names of the physicians who would be working on their staffs. Furthermore, while Nilavar had disputes with Mercy's administration, the same could be said for another SRI radiologist, MacLean, whom Osborn did include in his group. Under these circumstances, the jury could have found that DIA's bid would have been successful even with the inclusion of Nilavar's name.

Osborn also argues that Nilavar's anticipated income could not be known with any certainty because Nilavar never offered any evidence of the terms of his alleged employment relationship with DIA, for example, the amount of Nilavar's compensation or even the duration of DIA's existence. Again, we disagree.

The express purpose of Nedelman's May 18 proposal was to preserve the then-existing jobs of the radiologists at SRI. SRI radiologists like Nilavar reasonably interpreted this to mean that the two new groups that would succeed SRI would be constituted on a basis similar to SRI. An exception to this was that certain matters not involving the make-up of the group or their compensation would ultimately be decided by the group's medical director.[5] Osborn himself confirmed this interpretation when he assured Nilavar that he was not creating a "fat cat" situation, but that they would all be equals. Furthermore, testimony from Peterson indicated that the type of exclusive contract DIA had with Mercy tended to create a "stable" relationship, which was corroborated by the fact that SRI had been Mercy's provider of radiological services from at least 1970 to December 1995. Under these circumstances, the jury could have determined Nilavar's lost anticipated income with a reasonable amount of certainty.

Given the foregoing, the trial court did not err in instructing the jury that it could award Nilavar his anticipated income, or lost profits, as damages.

Osborn's Fourth Assignment of Error on cross-appeal is overruled.

## V

Osborn's Fifth Assignment of Error on cross-appeal states:

 "The jury's award of $100,000 to plaintiff on his breach of contract claim is against the manifest weight of the evidence."

Osborn argues that the jury's verdict awarding Nilavar $100,000 in damages as a result of the breach of contract must be set aside because Nilavar failed to offer

---

5. See footnote 1.

any evidence through his damages expert Duvall or otherwise that would have allowed the jury to award him that amount.[6] In the alternative, Osborn argues that Nilavar's damages should have been capped at $38,332. In reaching this figure, Osborn notes that Duvall said that he used the employment contract of one of DIA's radiologists in preparing his damages scenarios. That contract would have provided Nilavar with annual compensation of $230,000 or $19,166 per month. Osborn points out, however, that the employment contracts of all employees at DIA contain a provision allowing the contract to be terminated with sixty days' notice "at the discretion of DIA's president," who, of course, is Osborn. Therefore, Osborn asserts, Nilavar is entitled, at most, to two months' salary. We find both of Osborn's arguments unpersuasive.

Initially, there are several possible explanations for the jury's award, and there is evidence in the record to support each. For instance, the jury, which was allowed to believe all, part, or none of what each witness had to say, could have believed Nilavar's claim that he was disabled as a result of Osborn's breach of his agreement for several months, but not for as long a time as Nilavar claimed. It may also have been confused by Duvall's testimony on how he calculated Nilavar's damages. Whatever the reason the jury may have had, there was evidence to support the $100,000 award to Nilavar. In fact, the award was very much on the "low end" of what it could have awarded him, based upon the evidence before it.

With regard to Osborn's claim that Nilavar's damages should have been capped at two months' salary, as we noted in relation to Osborn's Fourth Assignment of Error on cross-appeal, Nedelman's proposal at the May 18 meeting was designed to preserve the then-existing jobs of the SRI radiologists. Nilavar and his fellow shareholders reasonably interpreted this to mean that, outside of some issues for which Mercy wanted a "strong medical director," the new group would continue with the same arrangement as the old, where it took a two-thirds vote to remove a shareholder. Accordingly, we reject Osborn's proposition that the level of Nilavar's contract damages should be limited by Osborn's current right at DIA to terminate any employee at will, since that is not a part of the contract on which the parties agreed.

Osborn's Fifth Assignment of Error on cross-appeal is overruled.

## VI

Nilavar's Second and Third Assignments of Error state:

---

**6.** In fact, Duvall assessed Nilavar's damages at $3.9 million.

"The trial court erred by erroneously instructing the jury on the elements of plaintiff's breach of fiduciary claim.

"The trial court erred in directing a verdict in defendant's favor despite evidence sufficient to support an award of punitive damages and attorney fees."

Nilavar argues that the trial court erred by instructing the jury that it had to find the existence of a joint venture before it could find for him on his breach of fiduciary duty claim.[7] Nilavar argues that this court in *Nilavar*, 127 Ohio App.3d 1, 711 N.E.2d 726, was merely drawing an analogy between the concept of a joint venture and the relationship that existed between Osborn and the other SRI physicians. Nilavar asserts that fiduciary relationships cannot be "pigeonholed into narrow categories or specifically labeled relationships" like joint ventures, and insists that a fiduciary relationship existed in this case because "the parties agreed to repose their confidence in Osborn's acting on their behalf and delegated that responsibility to him." Nilavar further argues that the trial court erred by directing a verdict against him on his request for punitive damages. We find these arguments unpersuasive.

In *Nilavar, supra,* this court reversed the trial court's grant of summary judgment in favor of Osborn and DIA regarding Nilavar's breach of fiduciary duty claim. In reaching this conclusion, we rejected Nilavar's claim that a confidential relationship existed between him and Osborn by virtue of their position as fellow shareholders in SRI, since the parties agreed that SRI could not exploit the opportunity at Mercy under the terms of its request for proposals, and SRI shareholders had committed themselves to dissolving the corporation after May 18, 1995.

Nevertheless, we recognized that the parties' prior relationship "may have added an element of confidentiality or trust to a subsequently developed relationship, which may then have given rise to fiduciary obligations." *Id.,* 127 Ohio App.3d at 20, 711 N.E.2d at 738. We determined that the business relationship that developed between the parties after the vote to dissolve SRI was "something akin to a partnership, or more specifically, something in the nature of a joint venture," and concluded that "Nilavar's claim of a common scheme to submit a proposal to Mercy essentially implicate that this type of business relationship

---

7. Nilavar does not argue that the trial court's instruction on the elements of a joint venture erroneously included the requirement that each member of a joint venture possess an equal right to control the undertaking. It has been held with respect to joint ventures that one party to a joint venture may knowingly relinquish control of one aspect of the venture to another. *Kahle v. Turner* (1979), 66 Ohio App.2d 49, 52, 20 O.O.3d 111, 113, 420 N.E.2d 127, 130. Nilavar did not object to the form of the jury instruction given by the trial court on joint venture and proffer his own version, as required by Civ. R. 51(A). He merely objected to the giving of the instruction that the jury had to find the existence of a joint venture before it could find for him on his breach of fiduciary duty claim. This was properly overruled.

[*i.e.*, a joint venture] existed." *Id.* at 20, 711 N.E.2d at 738. After noting that the fiduciary relationship created by a joint venture imposes a duty of full disclosure and a duty against self-dealing or secret advantage between the fellow venturers, we found that sufficient evidence had been presented to create a triable issue of fact regarding whether Osborn breached these duties.

Contrary to what Nilavar asserts, the language used by this court in *Nilavar* extends well beyond simply drawing an analogy between joint ventures in general and the relationship that may have existed between the parties. This court, while rejecting Nilavar's claim that a confidential relationship arose between the parties by virtue of their positions as fellow shareholders in a close corporation, found that a confidential relationship might have existed between the parties by virtue of a common scheme to submit a bid in response to Mercy's request for proposals. We determined that the "common scheme," if one existed as Nilavar alleged, would have "essentially implicated" the existence of a joint venture between the parties, and that certain fiduciary obligations would have arisen between the parties as a result of that particular type of business relationship. *Id.* at 20, 711 N.E.2d at 738. Consequently, the trial court did not err by instructing the jury as it did.

Furthermore, because the jury found against Nilavar with respect to his claims for breach of fiduciary duty and fraud, the trial court did not err in directing a verdict against him with respect to his claim for punitive damages, since the only claim upon which Nilavar prevailed was his claim for breach of contract. See *Digital & Analog Design Corp. v. N. Supply Co.* (1989), 44 Ohio St.3d 36, 45–46, 540 N.E.2d 1358, 1366–1368 (as a general rule, punitive damages are not recoverable in a breach of contract action no matter what the motive of the breaching party and no matter how willful the breach).

In light of the foregoing, Nilavar's Second and Third Assignments of Error are overruled.

## VII

Nilavar's First Assignment of Error states:

"The [trial] court erred in refusing to permit plaintiff to discover financial information relevant to proving his damages claims."

Nilavar argues that the trial court erred by overruling his motion to compel discovery of financial records from Osborn and DIA, including Osborn's and DIA's tax returns, and DIA's corporate financial records on the grounds that the records were irrelevant. We agree that the trial court abused its discretion in overruling Nilavar's motion to compel.

Civ.R. 26(B)(1) provides:

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things * * *."

The scope of discovery is subject to the "controlled discretion" of the trial court. Klein & Darling, Civil Practice (1997) 6, Section 26–1. "[T]he concept of relevancy is not limited to the issues in the case, but to the subject matter of the action, the latter being broader than the former." *Id.*

Here, the financial records from DIA represented the first, best source of information regarding Nilavar's claim for lost profits or "anticipated income." In fact, the trial court's decision to instruct the jury that Nilavar could recover his anticipated income as part of the damages arising from his having been excluded from the bid is at odds with its refusal to compel discovery of Osborn's and DIA's financial records on relevancy grounds.

 Osborn argues that Nilavar should be precluded from raising this issue now, since he could have raised it in his appeal from the summary judgment granted in Osborn's and DIA's favor. We disagree.

Prior to granting Osborn and DIA summary judgment, the trial court overruled Nilavar's motion to compel discovery of Osborn's and DIA's financial records. After this court reversed the grant of summary judgment and remanded the cause to the trial court, Nilavar asked the trial court to reconsider its earlier ruling. The trial court overruled Nilavar's motion to reconsider.

 By reversing the grant of summary judgment in favor of Osborn and DIA, and against Nilavar, this court returned jurisdiction of the case to the trial court, which retains jurisdiction to reconsider its interlocutory orders, either *sua sponte* or upon motion, any time before it enters final judgment in the case. *Gismondi v. M & T Mtge. Corp.* (Apr. 13, 1999), Franklin App. No. 98AP–584, unreported, 1999 WL 257791. Therefore, Nilavar was free to appeal from the trial court's decision overruling his motion for reconsideration. Had this court opined concerning the discovery issue in deciding Nilavar's first appeal, that opinion might have become the law of the case, but in the absence of any direction from this court in its mandate remanding the case, interlocutory discovery orders were subject to reconsideration.

 Osborn also argues that any error the trial court may have committed in overruling Nilavar's motion to compel was harmless, because (1) Nilavar had all of the information he needed to make his damages claim, (2) the jury rejected Nilavar's expert because he was careless and unreliable, and (3) Nilavar's case was about a bid, not future employment. We disagree.

Pursuant to the "harmless error" rule, the existence of error does not require reversal of a judgment unless the error is materially prejudicial to the complaining party. *Fada v. Information Sys. & Networks Corp.* (1994), 98 Ohio App.3d 785, 649 N.E.2d 904. Errors will not be considered prejudicial where their avoidance would not have changed the outcome of the proceedings.

As we have previously explained, Nilavar was entitled to collect damages for "anticipated income," stemming from his exclusion from the bid. Furthermore, we cannot say that if the trial court had permitted Nilavar access to Osborn's and DIA's financial records, the outcome of the proceedings would not have changed. While the jury may have limited its award to Nilavar to $100,000 because it did not credit Nilavar's assertion that Osborn's actions rendered him permanently disabled, the jury may, in the alternative, have limited Nilavar's award on the grounds that it did not find Duvall's projections to be credible, due to Osborn's sharp attacks on Duvall during cross-examination. If Duvall had the financial information that Nilavar sought from Osborn and DIA, that might well have bolstered Duvall's credibility with the jury, and the jury might have been willing to accept his projections regarding Nilavar's damages.

Accordingly, Nilavar's First Assignment of Error is sustained.

## VIII

Nilavar's Second and Third Assignments of Error, and all of Osborn's Cross-Assignments of Error, having been overruled, but Nilavar's First Assignment of Error having been sustained, the judgment of the trial court is *affirmed in part*, and *reversed in part*, and this cause is *remanded* for a new trial. Because the error upon which reversal is predicated affected only the computation of damages, the trial on remand shall be limited to the issue of the proper amount of damages that Nilavar should be awarded, Osborn's liability for breach of contract already having been established.

*Judgment accordingly.*

GRADY, P.J., and WOLFF, J., concur.