OPINION
In this case, Jerry Means appeals from a judgment of the Small Claims Division of the Darke County Court, awarding Gary Yocum $492 on a claim regarding mechanical work done on automobiles. In support of his appeal, Means raises the following assignments of error:
 "The judgment of the trial court is contrary to the manifest weight of the undisputed evidence which was before the court.
 "The trial court failed to provide fundamental due process to Defendant-Appellant, Jerry Means, in violation of the Due Process clauses of the Ohio Constitution and the Fourteenth Amendment to the Constitution of the United States by failing to offer Defendant-Appellant, Jerry Means, any time or opportunity to cross-examine the Plaintiff-Appellant, Gary Yocum, who testified to the court on his own behalf."
 After reviewing the record and applicable law, we find the assignments of error without merit. Accordingly, the trial court judgment will be affirmed.
I, Appellant, Jerry Means, contends in the first assignment of error that the trial court judgment was against the manifest weight of the evidence. The trial judge heard evidence from both parties and issued a judgment for Plaintiff-Appellee, Gary Yocum, in the amount of $492. The judge did not explain his reasons, but simply put on a judgment entry for the pertinent amount. Means acknowledges that the trial judge tried to understand the oral agreement between the parties. However, Means believes the judge "lost track" of the transaction and became confused. As a result, Means thinks the judge improperly allowed Yocum to retain the benefit of Means' labor, some parts purchased by Means, and a vehicle that was purchased as part of the transaction.
In situations involving manifest weight challenges, "`[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury [or trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52
(citation omitted) (parenthetical material added). However, even though appellate courts can consider credibility, such matters are generally within the domain of the trier of fact. As a result, our role in weighing evidence is limited to making sure a miscarriage of justice has not occurred. Nilavar v. Osborn (2000), 137 Ohio App.3d 469, 483.
As an additional point, we note that the decision in this case was merely a general judgment for the plaintiff, without any explanation as to the court's thinking. This was permissible, since trial courts are allowed to issue general judgments. Trial courts also do not have to issue findings of fact unless a party files a request under Civ.R. 52. Where a party fails to request findings of fact and conclusions of law, we must presume the regularity of the trial court proceedings. See, e.g., Bunten v. Bunten (1998), 126 Ohio App.3d 443, 447. The lack of findings obviously circumscribes our review and presents a difficult challenge for an appellant who claims that the trial court decision is against the manifest weight of the evidence. See In re Carter (Nov. 8, 1999), Butler App. No. CA99-03-049, 1999 WL 1015709, *4.
We have reviewed the entire trial record, including the exhibits and transcript. Although most facts do not appear to be disputed, the transaction between the parties was very convoluted. Apparently, Means and Yocum worked together at a General Motors plant. Yocum owned a 1985 Firebird that did not have a motor. Means was a good mechanic, and recommended that Yocum have a V8 engine installed. The two men located a 1985 Camaro with a motor and transmission that would work, and Yocum purchased the Camaro for $275.
At the time the Camaro was purchased, it did not start. However, Means was able to change some wiring around and get the car started. Yocum then drove the Camaro from Bellbrook, Ohio, to Means' house, near Greenville, Ohio. About a mile or less from Means' house, the Camaro stopped running, and they pushed it the rest of the way.
The Firebird was then towed to Means' house, so that the Camaro motor could be installed. However, the two men decided that instead of using the Camaro motor, Means would use another motor that he already owned. In exchange, Yocum would give Means the Camaro motor, plus a used motor that Yocum had purchased from a fellow General Motors employee for $50. Means felt he could eventually combine these two into one good motor, since the top half of the Camaro motor and the bottom half of the $50 motor were functional. Yocum also agreed to pay Means about $450 in labor costs for the anticipated work on the Firebird.
Along the way, other parts were purchased for the Firebird motor. The total cost of these parts appears to have been between $363.74 and $389.55. Some tires and rims were also purchased, but they did not fit the car. Yocum paid for all the parts.
Means was nearly finished with the work when the two men had a falling out at work. By that time, Means had the Firebird running, but needed to seal a leak. As a result, Means disconnected the motor from the transmission. Although Means intended to seal the leak, he apparently had a change of heart. On October 18, 2001, Means deposited $398 in Yocum's account at the credit union, without Yocum's knowledge. This sum was intended as reimbursement for parts Yocum had purchased for the motor.
Subsequently, on October 21, 2001, Means left a note at Yocum's house, indicating that he was backing out of the deal. Yocum then filed this lawsuit on November 2, 2001. After the case was filed, Means delivered the Firebird to Yocum's house, minus the rebuilt motor. Means also delivered the Camaro to Yocum's house. The Camaro did have a motor, but the motor was sitting backwards in the engine compartment. Although Yocum testified that he did not know which motor was in the car, Means indicated that it was the original Camaro motor.
According to Means' brief, the $492 awarded by the trial court is equal to the following costs: 1) parts for the motor ($364); 2) the Camaro ($275); 3) the used engine ($50); 4) improper tires and the charge for mounting rims on the tires ($140); and 5) the trailer used to tow the Firebird to Means' house ($61). The total of these items is $890. When the sum Means paid to Yocum ($398) is subtracted, that leaves $492, or the amount of the judgment. As we said, Means claims this is not supported by the evidence.
"Generally, a party who has suffered damages as a result of a breach of contract is entitled to his `expectation interest,' or `his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" Nilavar,137 Ohio App.3d 469, 494, citing Restatement of the Law 2d, Contracts (1981) 102-103, Section 344. However, the non-breaching party also has the option of restitution, i.e., he may recover the benefits he has conferred upon the breaching party by his performance under the contract. Yurchak v. Jack Boiman Const. Co. (1981), 3 Ohio App.3d 15,16.
In the present case, the parties contracted for installation of a rebuilt motor in the Firebird. Although Means could easily have fulfilled the agreement, he chose to breach it. Moreover, whether or not Means was justifiably upset with Yocum over an unrelated matter is irrelevant. The fact that Means attempted his own form of restitution also does not excuse the breach, since he did not have the right to choose the form of remedy. That option is given to the non-breaching party.
Decisions on damages are "within the discretion of the trial court, and will be sustained if * * * [they are] supported by sufficient credible evidence and * * * [are] not against the manifest weight of the evidence." Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 487. Although Yocum testified that his damages were $2,000, the only particular items he mentioned were the cost of the replaced motor parts, the Camaro expense, and the money he spent on the used engine. These items totaled $689. After subtracting the $398 Means paid, the remaining amount is $291. We do not think adding the $61 cost of towing the Firebird to Means' house was unreasonable. We also think the court was justified in adding the $140 for the improper tires and rim-mounting charge. Specifically, Yocum testified that Means agreed to deduct these items from his labor charge, and Means did not dispute that fact.
Finally, even though Means believes he is entitled to compensation for his labor, he forfeited the ability to collect when he removed the rebuilt engine from the car. Since Means retained the engine, he received the benefit of his own labor. Why Means made this choice instead of simply delivering the nearly completed car and collecting for labor will have to remain a question for the ages. A similar observation could be made about many disputes.
Since evidence in the record supports the trial court's judgment, the first assignment of error is without merit and is overruled.
 II
In the second assignment of error, Means contends (without citation of any authority), that his due process rights were violated because the trial court did not tell him that he was entitled to cross-examine Yocum. As the Ohio Supreme Court has noted, "[t]he small claims divisions of municipal and county courts are intended to provide a forum for persons with relatively small, uncomplicated claims to seek redress without the need for attorney representation." Klemas v. Flynn,66 Ohio St.3d 249, 252, 1993-Ohio-45. By the same token, small claims litigants do have the option of using attorneys. Litigants who choose to proceed pro se are presumed to know the law and correct procedure, and are held to the same standards as other litigants. See, e.g., Kilroy v.B.H. Lakeshore Co. (1996), 111 Ohio App.3d 357, 363. As the Eighth District Court of Appeals aptly noted in Kilroy, a pro se litigant "cannot expect or demand special treatment from the judge, who is to sit as impartial arbiter." Id.
The trial judge in the present case treated both pro se litigants equally and impartially. Although the judge did not tell either party about the "right" to cross-examine, he had no obligation to do so. Both sides were clearly given a chance to explain their version of the facts. And, as we said, the facts were really not in dispute.
Based on the preceding discussion, the second assignment of error is without merit and is overruled.
Since both assignments of error have been overruled, the judgment of the trial court is affirmed.
FAIN, J., and YOUNG, J., concur.