[Cite as *Frank Novak & Sons, Inc. v. A-Team, L.L.C.*, 2014-Ohio-922.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

## JOURNAL ENTRY AND OPINION
## No. 99777

---

# FRANK NOVAK & SONS, INC.

### PLAINTIFF-APPELLEE/
### CROSS-APPELLANT

vs.

# A-TEAM, L.L.C., D.B.A. SERVICEMASTER

### DEFENDANT-APPELLANT/
### CROSS-APPELLEE

---

## JUDGMENT:
## AFFIRMED IN PART, REVERSED IN PART,
## AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-09-685057

**BEFORE:** Boyle, A.J., E.A. Gallagher, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** March 13, 2014

**ATTORNEY FOR APPELLANT**

Kevin J. Kelley
Porter Wright Morris & Arthur
925 Euclid Avenue
Suite 1700
Cleveland, Ohio   44115

**ATTORNEYS FOR APPELLEE**

Keith R. Kraus
Grant J. Keating
Dworken & Bernstein Co., L.P.A.
50 South Park Place
Painesville, Ohio   44077

MARY J. BOYLE, A.J.:

{¶1} Defendant-appellant, A-Team, L.L.C., d.b.a. ServiceMaster ("ServiceMaster") appeals the trial court's judgment in favor of plaintiff-appellee, Frank Novak & Sons, Inc. ("Novak") on Novak's breach of contract claim and ServiceMaster's counterclaims for breach of contract and unjust enrichment. Novak also cross-appeals, challenging the trial court's judgment with respect to its claim under R.C. 4113.61 ("Ohio's Prompt Payment Act"). We affirm the trial court's award in favor of Novak on its breach of contract claim, reverse the trial court on its application of the Prompt Payment Act, and remand for further proceedings.

### Procedural History and Facts

{¶2} This case involves a dispute between a general contractor and subcontractor related to work performed in the summer of 2007 to restore the Cleveland Browns Stadium (the "Property") in time for the Browns' first pre-season game. On July 14, 2007, during a concert, the Property sustained severe water damage because of faulty plumbing. The next day, ServiceMaster was hired as the general contractor to perform cleaning, restoration, and construction for the Property. ServiceMaster, in turn, hired Novak as a subcontractor to perform painting, flooring, and wall covering work. While the parties were performing work related to the July 14th incident, a severe rainstorm occurred on August 2, 2007, causing further damage to the Property, and resulting in Novak performing additional work.

{¶3}   Novak brought the underlying action seeking to recover money allegedly owed by ServiceMaster in connection with work Novak performed for the August 2, 2007 project.   Novak further sought to separately recover prejudgment interest and attorney fees under R.C. 4113.61, Ohio's Prompt Payment Act, for ServiceMaster's alleged failure to timely pay after having received payment itself.

{¶4}   The parties disputed the nature of the contract that governed, and both parties ultimately changed their respective positions during the course of the litigation.   While Novak initially asserted that the parties entered into a "subcontractor agreement" and attached a written subcontractor agreement to the complaint, Novak changed its position and filed an amended complaint, asserting that the parties "entered into an oral agreement." Conversely, ServiceMaster initially answered the complaint and responded to requests for admissions, denying that the subcontractor agreement was the contract between the parties. It then, however, amended its answer to state that the parties entered into a written subcontractor agreement — the same subcontractor agreement attached to Novak's original complaint ("subcontractor agreement").

{¶5}   After Novak filed its second amended complaint, ServiceMaster answered and asserted two counterclaims for breach of contract and unjust enrichment. ServiceMaster alleges that all the work performed by Novak was governed by the single written subcontractor agreement, signed by ServiceMaster's president, Ed Ranieri. ServiceMaster alleged that the severe rain of August 2, 2007, resulted in an expanded scope of work but that the parties agreed that Novak would continue to provide flooring and

painting services "under the terms of their agreement." ServiceMaster further alleged that Novak "breached this agreement as it has been paid substantially more than what is provided in their agreement." ServiceMaster's claim is based on two specific provisions in the subcontractor agreement — (1) "an administrative fee provision" providing that all payments are subject to a 20 percent administrative fee, and (2) "a pay when paid provision" providing that Novak will be paid when ServiceMaster has received payment from the property owner, the property owner's agent and/or the relevant insurance company.

{¶6} In support of its unjust enrichment claim, ServiceMaster alleged that it made payments to Novak totaling $430,000 and that Novak negotiated an additional payment of $100,450 directly from the Cleveland Browns, of which it never informed ServiceMaster. Based on these collective payments, ServiceMaster alleged that Novak has been overpaid for its work on the Property and that "it would be unjust for [Novak] to retain this benefit."

{¶7} The case ultimately proceeded to a bench trial.

{¶8} Novak presented documentary evidence establishing that ServiceMaster entered into separate contracts with the property owner's agent to perform restoration work on the Property in response to the pipe–sewer backup of July 14th ("Loss 1") and the rainwater intrusion on August 2nd ("Loss 2").

{¶9} Bradley Pinchot, vice president of Novak, testified that his company was hired by ServiceMaster to perform services related to both Loss 1 and Loss 2, but that Loss 1 and Loss 2 were two separate projects. Pinchot expressly denied that Loss 2 was an

extension of the scope of work under Loss 1.  According to Pinchot, ServiceMaster specifically required Novak to distinguish from the work it performed with respect to Loss 1 and Loss 2 because they were two separate projects.

{¶10} With respect to Loss 2, Pinchot testified that Novak had an oral contract with ServiceMaster to perform the work.  Specifically, Pinchot testified that he entered into an oral contract with Pete D'Agostino, a project executive from ServiceMaster, for Novak to perform the work on Loss 2 and that ServiceMaster would pay on a "time and material basis."

{¶11} Pinchot further testified that he had received the subcontractor agreement "two or three weeks after" Novak commenced work at the stadium.  Pinchot stated that he never signed or approved the terms.  With respect to the administrative fee provision in the subcontractor agreement, Pinchot testified that the 20 percent administrative fee "is actually more than what is in [Novak's] billing rate for allowable overhead and profit," and therefore Novak never agreed to the agreement.  Pinchot explained that Novak would have lost money from day one if it agreed to the subcontractor agreement so "we didn't execute it for that reason."  Pinchot further explained that Novak pulled its people from other jobs to work on Loss 1 and that it never would have pulled labor off other paying jobs to work on another job that Novak would lose money from the inception.

{¶12} Novak submitted invoices totaling $535,000 for flooring work performed on Loss 1.  It is undisputed that Novak received $430,000 in payment from ServiceMaster.  According to Pinchot's testimony, these payments were applied to Loss 1 invoices, which

were their oldest outstanding invoices. Pinchot testified that ServiceMaster never applied a 20 percent administrative fee to the invoices submitted by Novak. With respect to the outstanding balance on Loss 1 and other unpaid invoices that Novak had from other contractors that it performed work for related to the faulty plumbing, Novak placed a mechanic's lien on the Property, prompting the Browns to directly negotiate a settlement with Novak on its Loss 1 claims ($100,450) in return for its release of the lien. The settlement agreement was executed on June 13, 2008, and releases any claims with respect to Loss 1 against ServiceMaster and the other contractors. The settlement agreement, however, expressly excludes any claim that Novak may have regarding Loss 2 and preserves its right to pursue such a claim.

{¶13} As for the Loss 2 work, Pinchot testified that Novak initially submitted an invoice, dated August 21, 2007, for its services in the amount of $39,643.15, which included an estimate of future work to finish the project that ServiceMaster requested Novak to include. According to Pinchot, Novak subsequently submitted a revised invoice, which reflected the actual labor and materials used, resulting in a reduced invoice of $37,158.82. Pinchot testified that, although the insurance company approved this invoice for payment in the amount of $31,000, Novak never received any payment from ServiceMaster on this invoice.

{¶14} Novak further presented the testimony of Erica Burmeister, who previously worked in the administrative department of ServiceMaster and was assigned as the project auditor for the Cleveland Browns job. According to an internal document prepared by

Burmeister, the $430,000 in payments made by ServiceMaster were for Loss 1 payments, and no payments were made toward Loss 2.

{¶15} Novak called ServiceMaster's president, Ed Ranieri, as a witness, who admitted on direct examination that all of the work performed by Novak on Loss 1 and Loss 2 was "excellent." Ranieri further testified that Pete D'Agostino hired Novak with respect to Loss 2. Although Ranieri initially stated that Novak entered into an "oral" contract with ServiceMaster, he immediately recanted, indicating that the relationship was always governed by the written subcontractor agreement.

{¶16} Ranieri acknowledged that he never objected to any of the invoices submitted by Novak. Ranieri further corroborated Pinchot's testimony that the insurance company approved $31,617.28 on Novak's final Loss 2 invoice. Ranieri further confirmed that ServiceMaster received two separate $100,000 checks on January 9, 2008, with respect to Loss 2 invoices.

{¶17} On cross-examination, Ranieri testified that ServiceMaster hired "probably 20, 25" subcontractors on the Cleveland Browns Stadium job and that it required executed written subcontractor agreements from all of its subcontractors given that it involved a "multimillion dollar gig." According to Ranieri, there was no oral contract with Novak. Ranieri testified further that the additional work caused by the August 2, 2007 rainstorm fell within the scope of the original written subcontractor agreement. Ranieri stated that Novak never indicated that it considered the additional work to be a "separate job" nor did it ever discuss separate contractual terms for Loss 2.

{¶18} Ranieri further testified that ServiceMaster, as the general contractor, received invoices from the subcontractors that it forwarded to the insurance adjustor, the city of Cleveland, and the Cleveland Browns. According to Ranieri, ServiceMaster's invoices were not paid in full — "not even close." Ranieri stated that ServiceMaster "took a 1.2 million hit" on this job. Ranieri also testified that, when it received payment from the owner or the owner's agent, the payment was never accompanied with instructions as to which subcontractor's invoices should be paid. According to Ranieri, ServiceMaster paid Novak $430,000 on its invoices despite only $409,000 being approved. Applying the administrative fee in the written agreement and the allowed adjusted amount, Ranieri testified that Novak was only entitled to $327,578.50 with respect to all the work performed.

{¶19} The trial court also heard testimony from Gregory Zeigler, an account manager at Affiliated FM Global, who was the adjustor handling the claims submitted in response to Loss 1 and Loss 2. According to Zeigler, Affiliated FM Global received a total of $297,346 in invoices regarding work performed for Loss 2. Of the invoices submitted, $31,617.28 was specifically approved and earmarked for Novak's work on Loss 2.

{¶20} In support of its case, ServiceMaster offered the testimony of Gary Cerasi, ServiceMaster's accountant for approximately the last ten years. According to Cerasi, a 20 percent administrative fee provision is very common in the construction industry. Cerasi testified as to his familiarity with the invoices submitted by Novak to ServiceMaster

regarding the Property. Cerasi assisted ServiceMaster "to help job cost the job" and oversaw the invoices to "make sure the overall accounting of the job was being taken care of." According to Cerasi, he never knew "about Loss 1 or Loss 2 until we saw the Affiliated things way down the road." Cerasi further testified that, even if the insurance company for the owner asked the subcontractor to classify the job as "Loss 1 [and] Loss 2," there is no accounting reason for ServiceMaster to consider the job that way. Cerasi further testified that ServiceMaster never received any instructions as to how to apply payments upon receipt from either the Cleveland Browns, Affiliated FM Global, or the city of Cleveland.

{¶21} According to Cerasi, after applying the adjustments made to the invoices submitted, Novak should have been paid no more than $409,473. Cerasi further testified that the administrative fee should have applied to that amount resulting in Novak receiving a reduced payment of $327,598.

{¶22} On cross-examination, Cerasi acknowledged that he did not have any personal knowledge as to the parties entering into the written agreement. Cerasi further acknowledged that he had no personal knowledge of Novak ever agreeing to the adjustments made to Novak's invoices.

{¶23} Following the bench trial, the trial court issued its findings of facts and conclusions of law, awarding judgment in favor of Novak on its breach of contract claim in the amount of $37,158.82 and on ServiceMaster's counterclaims. The court found,

however, that ServiceMaster was not in violation of the Ohio Prompt Payment Act and awarded judgment in favor of ServiceMaster on this claim.

{¶24} ServiceMaster appeals from this judgment, raising three assignments of error:

> I.   The trial court erred in finding that the relationship between the parties was governed by an oral contract and not the written subcontractor agreement.

> II.   The trial court erred in concluding that plaintiff met its burden of establishing an oral contract.

> III.   Even if an oral contract was formed, the trial court erred by failing to determine the reasonable value of the services dating back to July 15, 2007.

{¶25} Novak has filed a cross-appeal, asserting the following single cross-assignment of error:

> I.   The trial court erred in denying Novak's claim for relief against ServiceMaster pursuant to R.C. 4113.61 (Ohio's Prompt Payment Act).

{¶26} We turn first to ServiceMaster's stated assignments of error.

### Standard of Review

{¶27} In a civil case, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

> A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.   A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

{¶28} In its first assignment of error, ServiceMaster argues that the trial court erred in concluding that the parties' relationship was governed by an oral contract and not the standard subcontractor agreement that ServiceMaster offered into evidence (hereby "the written agreement"). ServiceMaster's argument hinges on the following alleged facts: (1) Novak was presented with the written agreement drafted and signed by Edward Ranieri, president of ServiceMaster, at the inception of the project, namely, on or about July 15, 2007; (2) Novak received the contract and understood its terms; and (3) Novak began performing the work contemplated in the written contract. Although Novak never signed the contract, ServiceMaster contends that Novak's performance under the contract constitutes an acceptance of the written contract, thereby binding Novak under the contract.

{¶29} In support of this argument, ServiceMaster cites to several cases that hold a written contract that is not executed is enforceable if the parties proceed to act as if the contract is in effect. Specifically, ServiceMaster relies on this court's decision in *Jatsek Constr. Co. v. Burton Scot Contrs., L.L.C.*, 8th Dist. Cuyahoga No. 98142, 2012-Ohio-3966, and contends that it is controlling.

{¶30} In *Jatsek*, the subcontractor filed suit seeking payment for services it provided on a construction project. The general contractor, Burton Scot, faxed an agreement to Jatsek prior to the start of the project. Jatsek made some changes, signed it, and then returned a modified version of the agreement. Burton Scot, however, never signed the agreement. In response to Jatsek's complaint, Burton Scot moved to stay the proceedings

and compel arbitration based on an arbitration agreement contained in the agreement signed by Jatsek. The trial court ruled that no contract existed for the project and consequently denied the motion to stay. This court, however, reversed the trial court, finding an actual implied contract was formed between the parties upon the start of the work by Jatsek. Specifically, relying on *G. Herschman Architects, Inc. v. Ringco Mfg. Co., Inc.*, 8th Dist. Cuyahoga No. 67758, 1995 Ohio App. LEXIS 1940 (May 11, 1995), the court held that Jatsek's subsequent performance constituted an acquiescence to the written agreement containing the arbitration clause.

{¶31} We find *Jatsek* distinguishable. None of the parties in *Jatsek* asserted that an express oral contract governed their dispute. Nor was the trial court weighing evidence to resolve disputed facts. In this case, Brad Pinchot, Novak's vice president, testified that an express oral contract governed the parties' relationship. Specifically, he denied that there was a written contract. According to Pinchot, the parties had a "time and material agreement" — a method of contracting common in the construction industry.

{¶32} The evidence reveals that the written agreement was presented to Novak after Novak had already commenced work on the project. Specifically, Pinchot testified that he received the written agreement by fax two to three weeks after Novak had commenced work on the project. In *Jatsek*, the court's holding was based on the reasoning of *G. Herschman* and the principle that a party's commencement of the work may be sufficient evidence that the party has accepted the terms of the agreement — the critical point being

that the party was presented with the agreement prior to commencement of the work. This reasoning, therefore, does not apply in this case.

{¶33} Further, Novak presented evidence at trial that ServiceMaster denied the existence of a written contract between the parties in its response to Novak's request for admissions. And while both parties changed their respective positions during the litigation, the trial court was free to find one party more credible than the other. Moreover, ServiceMaster never applied a 20 percent administrative fee to Novak's invoices submitted with respect to Loss 1 — a key provision under the written agreement giving rise to ServiceMaster's overpayment claim. The first time that ServiceMaster even alleged that it overpaid Novak was nearly a year after Novak filed its lawsuit and more than two years after it made its last payment to Novak. Thus, ServiceMaster's specific conduct belies its claim that the written agreement governed.

{¶34} Accordingly, we find that the trial court was free to find that the parties entered an oral contract with respect to Loss 2 and that the written agreement signed by ServiceMaster's president did not govern either Loss 1 or Loss 2. Indeed, given ServiceMaster's inconsistent actions with the terms of the written agreement, we find that the trial court's finding that the written agreement does not govern is consistent with the weight of the evidence.

{¶35} The first assignment of error is overruled.

Proof of Oral Contract

**{¶36}** In its second assignment of error, ServiceMaster argues that the trial court erred in concluding that Novak had met its burden of establishing an oral contract with respect to Loss 2.

**{¶37}** "To succeed on a breach of contract claim, a party must prove the existence of a contract, that party's performance under the contract, the opposing party's breach, and resulting damage." *Ruple v. Midwest Equip. Co.*, 8th Dist. Cuyahoga No. 95726, 2011-Ohio-2923, ¶ 18.    To prove the existence of a contract, a plaintiff must show that both parties consented to the terms of the contract, that there was a "meeting of the minds" of both parties, and that the terms of the contract are definite and certain.    *Id.*, citing *Nilavar v. Osborn*, 137 Ohio App.3d 469, 738 N.E.2d 1271 (2d Dist.2000); *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631, 691 N.E.2d 303 (4th Dist.1996).

*1.    Evidence of Offer and Acceptance*

**{¶38}** ServiceMaster contends that Novak failed to present evidence of an offer and acceptance of an oral contract, and therefore there was never a meeting of the minds between the parties.    We disagree.

**{¶39}** Pinchot testified that he entered into an oral contract with Pete D'Agostino, who had the authority to contract on ServiceMaster's behalf.    Pinchot further testified that D'Agostino agreed to compensate Novak on a "time and material basis" and reimburse Novak for its expenses in exchange for Novak performing the required work.    The record further reveals that Novak completed the work and then submitted its final invoice, detailing its time and material on the job.    ServiceMaster never expressed any objection to

the invoice and indicated that payment would be forthcoming upon its receipt of payment from the Cleveland Browns and the city of Cleveland. We find Pinchot's testimony, coupled with the actions of the parties, provides competent, credible evidence to support the trial court's finding that the parties entered into an oral contract with respect to Loss 2.

### 2. Definite Terms

{¶40} ServiceMaster also contends that the alleged oral contract was lacking any definite terms to be enforceable. We disagree.

{¶41} The record contains sufficient evidence of definite terms to enforce the oral contract. The record reveals that Novak is a union shop with published union rates. Pinchot explained at trial that price terms in a time and material contract are calculated by adding hours worked at the published union rate to the cost of materials plus 10 percent. According to Pinchot, this method of pricing is understood in the construction industry, "including people from ServiceMaster." Pinchot further testified that Novak has done work for ServiceMaster in the past and that ServiceMaster understood Novak's rates. Based on this competent, credible evidence, we find that Novak met its burden to establish an oral contract with respect to Loss 2.

### 3. Trial Court's Stated Reasoning

{¶42} ServiceMaster also argues that the trial court's reasoning supporting the basis for an oral contract is inconsistent and chronologically impossible. Pointing to the trial court's finding that Pinchot's testimony was the only probative evidence of contract formation, ServiceMaster argues that the trial court relied on Pinchot's testimony to

conclude that ServiceMaster orally contracted with Novak to perform work in response to the August 2, 2007 damage. The trial court later concludes that the "parties' relationship with regards to the entire Cleveland Browns Stadium restoration project (Loss 1 and Loss 2) was governed by an oral contract." ServiceMaster argues that it is chronologically impossible that a single contract formed in response to the damage of August 2, 2007 (Loss 2) could also govern the formation of a contract for the earlier July 14, 2007 event (Loss 1).

{¶43} We find ServiceMaster's argument misplaced and no basis for reversal. The trial court's finding regarding contract formation specifically related to the oral contract governing Loss 2. Indeed, Novak's case was based solely on recovering for Loss 2, and therefore focused its presentation of the evidence on the contract formation for Loss 2. With respect to Loss 1, the trial court found that ServiceMaster failed to meet its burden that a breach of contract occurred under a written agreement. Based on our discussion above, the record supports the trial court's finding in favor of Novak on ServiceMaster's counterclaim. Thus, while the trial court also found that an oral contact governed Loss 1, the critical point is that it did not find that the written agreement governed Loss 1, thereby supporting its judgment in favor of Novak on ServiceMaster's counterclaim.

{¶44} The second assignment of error is overruled.

<u>Value of Novak's Services</u>

{¶45} In its third assignment of error, ServiceMaster argues that the trial court erred in failing to determine the reasonable value of Novak's services. According to

ServiceMaster, even assuming the written agreement did not govern and that an oral contract was formed, the trial court was required to determine the reasonable value of Novak's services for both Loss 1 and Loss 2.

{¶46} In support of this argument, ServiceMaster relies on the testimony of Gregory Zeigler, who was the insurance adjustor for Affiliated FM Global handling the two insurance claims submitted with respect to Loss 1 and Loss 2. Zeigler testified as to the amount of money approved with respect to Loss 1 and Loss 2, indicating that the insurance company made downward adjustments to the rates submitted by Novak for several reasons. He explained that the adjustments "could be because they aren't covered under the policy; it might not be loss related, or we might not based on disagreement over the rates or hours they were on site." Specifically, ServiceMaster contends that the amount approved by Affiliated FM Global, namely, $377,855.85 on Loss 1 and $31,617.28 on Loss 2, is the only evidence of the reasonable value of the Novak's services and the amount that Novak should have been paid. ServiceMaster further points to the testimony of its own accountant, Gary Cerasi, who indicated that Novak should have only been paid the amount approved by Affiliated FM Global.

{¶47} This argument, however, ignores that the trial court awarded Novak the amount submitted on Novak's Loss 2 final invoice, which contained line item charges for the time and materials that Novak furnished in response to Loss 2, totaling $37,158.82. Novak proved by a preponderance of the evidence that, under the terms of the oral contract for Loss 2, ServiceMaster agreed to pay Novak on a time and material basis. Notably,

ServiceMaster never objected to the charges contained in Novak's final Loss 2 invoice prior to the lawsuit. Instead, ServiceMaster excused its nonpayment on the basis that it had not been paid in full by the property owner.

**{¶48}** There is no evidence that Novak agreed to perform the work in exchange for the amount approved by the insurance company. Moreover, Affiliated FM Global's property damage summary, detailing downward adjustments to Novak's invoices, does not reflect a determination of the "reasonable value" of Novak's work. Instead, the summary simply addresses those portions of Novak's work covered under the policy of insurance. As stated by Zeigler, "we really don't review the work. We review the insurance contracts and decide what's recoverable." This testimony directly contradicts ServiceMaster's accountant's testimony that the reasonable value of services is based on the amount approved by the insurance company.

**{¶49}** Accordingly, we find that the trial court properly awarded Novak $37,158.82 on its breach of contract claim for Loss 2.

**{¶50}** Additionally, we find no merit to ServiceMaster's claim that the trial court failed to consider the reasonable value of Novak's services with respect to Loss 1 in resolving the counterclaim. ServiceMaster's counterclaim for breach of contract hinged on its assertion that the written agreement governed both Loss 1 and Loss 2 and, therefore, based on the "pay when paid" provision and the 20 percent administrative fee provision, it had overpaid Novak. Given that the trial court found that the written agreement did not govern Loss 1 and Loss 2, either individually or collectively, the trial court properly

concluded that there was no merit to ServiceMaster's overpayment claim and resolved the counterclaim in Novak's favor.

**{¶51}** We further find that ServiceMaster failed to meet its burden of proof that the amount it paid to Novak exceeded the reasonable value of the services provided. Again, the thrust of ServiceMaster's argument is based on the amount approved by Affiliated FM Global for the claim submitted with respect to Loss 1. As discussed above, this testimony is not persuasive proof of the reasonable value of Novak's services. Moreover, we find no basis to attribute the Cleveland Browns' payment toward Novak's Loss 1 invoices as grounds to support an unjust enrichment claim on ServiceMaster's behalf.

**{¶52}** The third assignment of error is overruled.

Prompt Payment Statute

**{¶53}** Novak argues in its sole cross-assignment of error that the trial court's refusal to award it damages under R.C. 4113.61 is against the manifest weight of the evidence and contrary to law.

**{¶54}** The statute provides in relevant part:

(A)(1)　If a subcontractor * * * submits * * * an invoice for materials to a contractor in sufficient time to allow the contractor to include the * * * invoice in the contractor's own pay request submitted to an owner, the contractor, within ten calendar days after receipt of payment from the owner for improvements to property, shall pay to the:

(a) Subcontractor, an amount that is equal to the percentage of completion of the subcontractor's contract allowed by the owner for the amount of labor or work performed;
* * *

The contractor may reduce the amount paid by any retainage provision contained in the contract, invoice, or purchase order between the contractor and the subcontractor * * *, and may withhold amounts that may be necessary to resolve disputed liens or claims involving the work or labor performed or material furnished by the subcontractor * * *.

If the contractor fails to comply with division (A)(1) of this section, the contractor shall pay the subcontractor * * *, in addition to the payment due, interest in the amount of eighteen per cent per annum of the payment due, beginning on the eleventh day following the receipt of payment from the owner and ending on the date of full payment of the payment due plus interest to the subcontractor * * *.

R.C. 4113.61(A)(1).

{¶55} Therefore, pursuant to R.C. 4113.61(A)(1), if a subcontractor makes a timely request for payment, a contractor must pay the subcontractor in proportion to the work completed within ten calendar days of receiving payment from the owner. *Masiongale Elec.-Mechanical, Inc. v. Constr. One, Inc.*, 102 Ohio St.3d 1, 2004-Ohio-1748, 806 N.E.2d 148, ¶ 16. A contractor, however, is permitted to withhold "amounts that may be necessary to resolve disputed liens or claims involving the work or labor performed or material furnished by the subcontractor." *Id.,* quoting R.C. 4113.61(A).

{¶56} Failure to comply with these provisions obligates a contractor to pay interest on the overdue payment at a rate of 18 percent per annum. R.C. 4113.61(A)(1) and

(B)(1). A subcontractor also may file a civil action to recover the amount due and the statutory interest. R.C. 4113.61(B)(1). If the court determines that the contractor has not complied with the prompt-payment statute, the court must award the subcontractor the statutorily prescribed interest. *Masiongale Elec.-Mechanical, Inc.* at ¶ 17.

{¶57} Novak argues that the record overwhelmingly establishes a violation of R.C. 4113.61. Specifically, Novak relies on the following factual findings by the trial court:

· The insurance company approved total payments of the Loss 2 subcontractors' invoices in the amount of $235,460.82. Affiliated FM specifically earmarked $31,617.28 of the $235,460.82 to pay Novak's final invoice.

· According to their own records, ServiceMaster received $200,000.00 in the form of two $100,000.00 checks on January 9, 2008.

· The final check paid to Novak by ServiceMaster in the amount of $75,000.00 was issued on December 28, 2007.

· Defendant's internal records establish that as of February 12, 2008,

the entire balance associated with Loss 2 was not paid by ServiceMaster.

{¶58} Based on these findings, which are supported by competent, credible evidence in the record, we find that there is a violation of Ohio's Prompt Payment Act. The trial court's verdict to the contrary is against the manifest weight of the evidence. Indeed, the record reveals that ServiceMaster never paid Novak on the Loss 2 contract, despite having received a partial payment of $31,617.28 that was specifically designated for Novak's Loss 2 invoice, and despite there being no objection to the invoice or dispute over Novak's services. The statute prohibits and penalizes this exact conduct.

**{¶59}** The trial court's finding that ServiceMaster's payment of $75,000 issued on December 28, 2007, was a prepayment of the $31,617.28 that ServiceMaster received on the Loss 2 claim is not supported by the evidence. At the time the $75,000 payment was received, Novak had open invoices for Loss 1 and Loss 2. Pinchot testified that the $75,000 payment was applied toward Loss 1 invoices — the oldest outstanding invoices. ServiceMaster's own internal bookkeeping records confirm that the $75,000 payment was made toward Loss 1 invoices. For this same reason, we cannot say that Ranieri's testimony that ServiceMaster's payment of $75,000 was for Loss 2 is credible; his testimony directly contradicts ServiceMaster's business records. Notably, even after the $75,000 payment, an outstanding balance of $54,297.01 remained on Novak's Loss 1 invoices — this amount, however, was settled through the agreement negotiated directly with the Cleveland Browns.

**{¶60}** ServiceMaster counters that the trial court's decision should stand based on the evidence that the $75,000 payment was made within ten days of ServiceMaster's receipt of the two checks it received from the owner and owner's agent to cover Loss 2 invoices. The record reveals, however, that these two checks were documented as received by ServiceMaster on January 9, 2008. ServiceMaster's bookkeeping records also show, as the trial court found, that as of February 12, 2008, the entire amount of Novak's Loss 2 invoice remained unpaid.

**{¶61}** In finding that the statute was not violated, the trial court improperly focused on the total payments made under Loss 1 and the insurance company's approval of less than

what ServiceMaster actually paid Novak on Loss 1. But we cannot ignore that Loss 2 constituted a separate agreement and, therefore, the trial court should have focused solely on ServiceMaster's conduct with respect to Loss 2.

{¶62} Because the record reveals that ServiceMaster did not make any payment to Novak with respect to Loss 2, nor did it ever dispute the invoice prior to Novak's commencement of the lawsuit, we fail to see how ServiceMaster escapes application of Ohio's Prompt Payment Act. This is not a situation where the contractor, in good faith, withholds amounts when there is a disputed claim. *See Consortium Communications v. Cleveland Telecommunications, Inc.*, 10th Dist. Franklin No. 97APG08-1090, 1998 Ohio App. LEXIS 524 (Feb. 10, 1998). Here, Novak is entitled to prejudgment interest because ServiceMaster did not assert a good faith basis to withhold the money. *See Gary Moderalli Excavating, Inc. v. Trimat Constr., Inc.*, 5th Dist. Tuscarawas Nos. 2012AP030022 and 2012AP030023, 2013-Ohio-1701, ¶ 49 ("if the contractor does not assert a good faith basis to withhold the money, then the subcontractor is entitled to prejudgment interest").

{¶63} But although Novak is entitled to prejudgment interest, the award of attorney fees is not automatic. In fact, R.C. 4113.61(B)(3) states that the court shall not award attorney fees if the court determines, following a hearing on the payment of attorney fees, that such an award would be inequitable. And while ServiceMaster has presented compelling reasons as to why the application of the attorney fees would be inequitable, this

determination lies within the sound discretion of the trial court. We therefore remand on this issue for the trial court to consider.

{¶64} In summary, ServiceMaster's three assignments of error are overruled, and the judgment is affirmed awarding Novak damages on its breach of contract claim. Novak's sole cross-assignment of error is sustained, thereby entitling it to prejudgment interest as set forth in R.C. 4113.61(A)(1), but the issue of attorney fees must be remanded for the trial court to consider.

{¶65} Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
PATRICIA ANN BLACKMON, J., CONCUR