[Cite as *Hal Fab, L.L.C. v. Jordan*, 2023-Ohio-4535.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

HAL FAB, LLC, ET AL.,                    :

    Plaintiffs-Appellees,           :

                        No. 112508

    v.                              :

RICHARD JORDAN, ET AL.,                  :

    Defendants-Appellants.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** December 14, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-912921

---

### *Appearances:*

Meyers, Roman, Friedberg & Lewis, R. Scott Heasley, Carly Glantz, and Amily A. Imbrogno, *for appellees* Hal Fab LLC and Brook Park Land Development I, LLC.

Mansour Gavin, LPA, Edward O. Patton, and Katie E. Epperson, *for appellants*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Richard Jordan ("Jordan"), appeals two judgments rendered against him and in favor of plaintiffs-appellees, Hal Fab, L.L.C. ("Hal Fab") and Brook Park Land Development I, L.L.C. ("Brook Park") (collectively

"appellees") following a bench trial and a hearing on attorney fees.  He claims the following errors:

1.  Whether the trial court erred in finding that the February 9, 2018 letter alone, amounted to a contract without regard to the limitations expressly stated in the February 7, 2018 letter.

2.  Whether the trial court erred in piercing the corporate veil of MacroTrend to impute personal liability onto appellant Jordan, who did not own the company and was merely an employee of MacroTrend.

3.  Whether the trial court erred in extending the guarantee language of the February 9, 2018 letter to all expenses, past to future, of appellees onto appellant Jordan.

4.  Whether the trial court erred in failing to grant appellant Jordan's motion for directed verdict, notwithstanding judgment.

5.  Whether the trial court erred by granting attorney fees and damages based upon exhibits withdrawn from trial and awarding breach of contract [sic] damage claims for the tort-based fraud claims.

6.  Whether the trial court erred as a matter of law by denying appellant Jordan's motion for summary judgment and motion for directed verdict related to fraud, piercing the corporate veil, breach of contract and promissory estoppel.

{¶ 2} We find merit to the appeal and reverse the trial court's judgments.

### I.  Facts and Procedural History

{¶ 3} This dispute involves a series of agreements related to the purchase of commercial property located in Hawesville, Kentucky ("the Kentucky property"). On April 18, 2017, Brook Park entered into a purchase agreement (the "original purchase agreement") with third-party Arconic Automotive Castings ("Arconic") to purchase the Kentucky property for $2.7 million.  Brook Park subsequently assigned it rights under the original purchase agreement to Hal Fab, a wholly-owned

subsidiary of Brook Park. Brook Park is solely owned and operated by Howard Lichtig ("Lichtig").

{¶ 4} Brook Park entered into the original purchase agreement with intent to either lease the property to third-party WhiteRock Pigments, Inc. ("WhiteRock"), sell the property to WhiteRock, or sell its interest in Hal Fab to WhiteRock. (Tr. 103.) WhiteRock had acquired intellectual property from Sherwin Williams to produce a paint pigment called titanium dioxide, and it sought financial investments of approximately $250 million to build a plant to produce the pigment.

{¶ 5} Defendant MacroTrend Capital Group, L.L.C., now MacroTrend Capital Group, Inc. (collectively "MacroTrend"), is a banking and asset-management company that procures funds from foreign investors interested in investing in American companies. Jordan was an employee of MacroTrend with the title of president throughout the events giving rise to this case. MacroTrend assured appellees that it would obtain the necessary financing for WhiteRock to develop factories on the Kentucky property. (Tr. 50.) Because Brook Park's purchase of the Kentucky property was to be financed through commercial funding with a lease to WhiteRock, the financing Brook Park needed to purchase the Kentucky property was contingent on WhiteRock becoming a tenant of the property. (Tr. 103, 236-237.) WhiteRock's ability to lease and operate on the Kentucky property was contingent on WhiteRock obtaining financing for its project. Thus, Brook Park could not purchase the Kentucky property unless WhiteRock obtained the necessary financing for its project.

{¶ 6} Under the terms of the original purchase agreement, Brook Park was required to make a good-faith deposit of $100,000 upon execution. Brook Park then had a 120-day evaluation period to complete its due diligence with closing to occur 30 days after the expiration of the evaluation period. The original purchase agreement provided Book Park with two options to extend the evaluation period for two additional 60-day periods with the payment of an additional $50,000 fee per extension. Brook Park also had the option to terminate the agreement for a full refund of its earnest money and extension fees during the first and second extensions of the evaluation period if the tenant was unable to satisfy the "Tenant Financing Contingency." (Tr. 56-57.)

{¶ 7} The initial evaluation period was set to expire on August 18, 2017. Because WhiteRock had not yet secured its financing, Brook Park extended the evaluation period for an additional 60 days until October 15, 2017, with the payment of an additional $50,000. (Tr. 59-60.) Because WhiteRock had not obtained funding prior to the expiration of the first extension, it extended the evaluation period for another 60 days through December 15, 2017, with the payment of an additional $50,000. Thus, by December 2017, Brook Park had paid $100,000 in earnest money upon execution of the original purchase agreement and two additional payments of $50,000 totaling $100,000 for two extensions of the evaluation period through December 15, 2017. Brook Park was entitled to a full refund of its deposits and extension fees totaling $200,000 on or before December 15, 2017, by giving notice to Arconic, that its prospective tenant,

WhiteRock, had failed to secure its financing. At some point in time, Brook Park assigned its rights under the original purchase agreement to Hal Fab.

{¶ 8} On December 14, 2017, Lichtig met with Jordan and the principals of WhiteRock, Leon Polott ("Polott") and Bob Meyer ("Meyer"), to discuss the closing date. Lichtig expressed concerns about the risk posed by the delay in WhiteRock's funding because his ability to terminate the original purchase agreement with a full refund of his deposit and extension fees was expiring the next day. Jordan assured Lichtig that the funds were coming from overseas and that they were awaiting transfer to the United States. In fact, WhiteRock signed a note guaranteeing payment of the funds held in escrow as well as Lichtig's expenses.[1] (Tr. 120-122, 124.) Lichtig nevertheless memorialized his concerns and his understandings in an email addressed to Meyer that same day wherein he stated, in relevant part:

> My ability to terminate my contract with Arconic (Alcoa) for cause ends tomorrow; up until this point, I could terminate based on your inability to get a financing commitment for your funding; if I terminate after tomorrow, I note [sic] only lose my money that is held in escrow ($200,000), but could also be subject to further damages or specific performance * * * not a road we want to go down * * *
>
> * * *
>
> We also discussed my ongoing risk, which is that although you have signed a note guaranteeing payment of funds held in escrow plus my expenses (which I certainly appreciate), from a practical standpoint, if the worst should happen and the deal doesn't move forward, I'm in trouble * * * I also appreciate [Jordan]'s sensitivity to my exposure (and yours as well) * * *.

---

[1] Appellees never sued WhiteRock, Polott, or Meyer to collect on the note. (Tr. 124.)

(Defendant's exhibit No. RJ 12, p.3.)

{¶ 9} On December 27, 2017, Hal Fab entered into a formal real estate purchase agreement with WRP Realty, L.L.C. ("WRP Realty"), a separate entity affiliated with WhiteRock, to allow WhiteRock to purchase the Kentucky property from Hal Fab for $10 million. WRP Realty never ended up buying the Kentucky property from Hal Fab because it ultimately never received the necessary funding. (Tr. 244-245.) Had the deal gone through, Lichtig would have realized a profit of about $7 million. (Tr. 106.)

{¶ 10} On or about January 12, 2018, Arconic and Hal Fab executed an amendment to the original purchase agreement (the "first amendment"), which extended the closing date to February 12, 2018. (Tr. 61; Defendant exhibit No. RJ 29.) There were no fees associated with this extension. (Tr. 62.) On February 18, 2018, Hal Fab executed a second amendment to the original purchase agreement ("second amendment"), which extended the closing date to March 12, 2018. The second amendment provided that if the sale failed to close by March 12, 2018, Hal Fab agreed to release $75,000 of the earnest money and to pay a one-time, non-refundable payment of $7,500 to the seller. (Plaintiff's exhibit No. 11.)

{¶ 11} On February 7, 2018, Lichtig and Jordan met a second time to discuss the status of the financing. Jordan told Lichtig that based on representations made by Kevin Gluckstal ("Gluckstal"), MacroTrend's shareholder and CEO, he was confident the financing would be provided and that there had been delays transferring the funds from Asia to Europe and from Europe to the United States.

At Lichtig's request, Jordan prepared a letter on behalf of MacroTrend dated February 7, 2018 (the "February 7th letter"), wherein Jordan recommended a one-month extension of appellees' agreement to purchase the Kentucky property. The February 7th letter states, in relevant part:

> As previously discussed on several occasions, MacroTrend Capital is the funding source providing the capital for the purchase of the Hawesville property by WhiteRock Pigments (via assignment from Hal Fab). We are committed to this purchase and the development of WhiteRock's facilities in Hawesville. The engineers and surveyors have completed their work and done a great job. The project is ready to move forward and our principals are excited about working with WhiteRock to develop this business opportunity.
>
> MacroTrend Capital had expected our funding to be completed by February 2, and the money available for closings by February 12. The money has not yet been transferred to MacroTrend for completing transactions. As such, we will need an extension of the agreement to acquire the property and make arrangements to close as soon as the funds are available. At this point there is no question as to the funding and MacroTrend is committed to this project.
>
> While MacroTrend expects to close soon, we are not yet able to confirm a date until the funds are transferred to our account. Therefore, it seems prudent for the parties to extend the contract for one month so this closing process takes place in an orderly manner. If agreeable with Arconic, I would be happy to come to Pittsburgh Thursday or Friday to meet them and answer any questions.

(Plaintiff's exhibit No. 16.) Jordan sent the February 7th letter to codefendant Gregory Lustig ("Lustig"), MacroTrend's general counsel and chairman of the board, for approval before sending it to Lichtig. (Plaintiff's exhibit No. 16; tr. 339.)

{¶ 12} On February 9, 2018, again at Lichtig's request, Jordan signed a letter (the "February 9th letter") on behalf of MacroTrend, promising to reimburse appellees for expenses in the event that MacroTrend failed to provide the necessary

financing to WhiteRock that would allow Hal Fab to purchase the Kentucky property. The February 9th letter states:

> This letter confirms the prior statements and the commitment of MacroTrend Capital Group LLC to reimburse Brook Park Land Development, Ltd. and Hal Fab LLC ("Purchaser") for all deposits, extension fees, and out of pocket expenses (including legal, surveyor, title, environmental, and travel costs) incurred by Purchaser in connection with the potential purchase of the Hawesville Property, should MacroTrend and WhiteRock fail to provide the financing necessary for the purchase of the Hawesville Property and/or the purchase of the membership interests in Hal Fab.

{¶ 13} By mid-March 2018, it was clear that MacroTrend was not going to be able to secure the financing necessary for the WhiteRock project. (Tr. 255-256, 387.) Lichtig had no further communications with Jordan after MacroTrend failed to secure funding by the March 12, 2018 deadline set forth in appellees' second amendment to the original purchase agreement. Nevertheless, Hal Fab, through Lichtig, requested several, additional extensions of the closing date after MacroTrend was no longer involved in the project. (Tr. 76-78, 91, 137.) The extensions cost an additional $15,000 each, and Hal Fab requested these additional extensions based on assurances from WhiteRock, not MacroTrend, that it was going to be able to obtain the funding and close the deal. (Tr. 94, 137.) WhiteRock continued to search for funding after it stopped dealing with MacroTrend in March 2018, and Lichtig never stopped seeking extensions of the original purchase agreement until Arconic "chose to go in a different direction." (Tr. 257-258.)

{¶ 14} In March 2019, appellees filed suit against Jordan, MacroTrend, Lustig, and Gluckstal (collectively "defendants") to recover all the deposits, fees, and

expenses appellees had paid in connection with the original purchase agreement and subsequent extensions. Appellees alleged that the February 9th letter constituted a guaranty of all of its expenses. The complaint was amended twice, and the second amended complaint asserted claims for breach of contract, fraud, and promissory estoppel.

{¶ 15} Appellees alleged that the February 9th letter constituted a contract and that the defendants breached the contract by failing to reimburse appellees for all of their expenses. They further alleged that the defendants committed fraud because they knowingly made false representations regarding their ability to obtain the financing necessary for appellees to purchase the Kentucky property. The appellees' promissory-estoppel claim alleged that appellees justifiably relied on defendants'-representations and that they would not have continued to pursue the transaction related to the Kentucky property if it had not been for the defendants' assurances.

{¶ 16} MacroTrend and Gluckstal failed to answer the complaint and upon motion, the court entered a default judgment against MacroTrend in the amount of $560,326.93 with respect to the breach-of-contract claim and a default against MacroTrend and Gluckstal, jointly and severally, in the amount of $560,326.93 on the fraud and promissory-estoppel claims. Jordan filed a motion to dismiss and for summary judgment, arguing he was not personally liable for appellees' damages because he acted at all times solely in his capacity as an employee of MacroTrend. He further argued, in the alternative, that even if he were considered an officer of

MacroTrend, he could not be held personally liable because there was no basis for piercing the corporate veil.

{¶ 17} The court denied Jordan's motion to dismiss and for summary judgment, and the case proceeded to a bench trial on appellees' claims against Jordan and Lustig in June 2021. At trial, appellees asked the court to pierce the corporate veil in order to hold Lustig and Jordan personally liable for their damages. The trial court issued a written decision on June 21, 2022, wherein it found in favor of appellees and against Lustig and Jordan on all claims. The court found that both Lustig and Jordan were corporate officers of MacroTrend. It also found that because MacroTrend committed fraudulent acts through Lustig and Jordan, appellees had established a valid claim to pierce the corporate veil. Accordingly, the court entered judgment against Lustig and Jordan, jointly and severally, in the amount of $501,091.43, inclusive of attorney fees in the amount of $127,688.34. The court's order also provided that additional attorney fees and expenses would be determined following a hearing on a later date.

{¶ 18} The trial court held a hearing on additional attorney fees on July 27, 2022. Seven months later, on February 27, 2023, the court issued a decision awarding appellees $29,351.32 in attorney fees. Jordan now appeals the trial court's judgments.

## II. Law and Analysis

### A. The February 9th Letter

{¶ 19} In the first assignment of error, Jordan argues the trial court erred in determining that the February 9th letter constituted an enforceable contract. In the third assignment of error, Jordan argues the trial court erred in extending the alleged guaranty language in the February 9th letter to all expenses, past to future. We discuss these assigned errors together because they both relate to our interpretation of the alleged contract document.

{¶ 20} The interpretation of a written contract is a matter of law subject to de novo review. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. In a de novo review, we review the merits of the case independently, without any deference to the trial court. *Sosic v. Stephen Hovancsek & Assocs., Inc.*, 8th Dist. Cuyahoga No. 109993, 2021-Ohio-2592, ¶ 21.

{¶ 21} A contract is generally defined as a promise that is actionable upon breach. *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). To be enforceable, a contract must have an offer, acceptance, consideration, and a manifestation of mutual assent. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. To prove the existence of a contract, the proponent of the contract must show that "both parties consented to the terms of the contract, that there was a 'meeting of the minds' of both parties, and that the terms of the contract are definite and certain." *Nilavar v. Osborn*, 137 Ohio App.3d 469, 484,

738 N.E.2d 1271 (2d Dist.2000), quoting *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631, 691 N.E.2d 303 (4th Dist.1996).

{¶ 22} In interpreting contracts, the court's role is "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11, citing *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Id.*

{¶ 23} The February 9th letter states:

> This letter confirms the prior statements and the commitment of MacroTrend Capital Group LLC to reimburse Brook Park Land Development, Ltd. and Hal Fab LLC ("Purchaser") for all deposits, extension fees, and out of pocket expenses (including legal, surveyor, title, environmental, and travel costs) incurred by Purchaser in connection with the potential purchase of the Hawesville Property, should MacroTrend and WhiteRock fail to provide the financing necessary for the purchase of the Hawesville Property and/or the purchase of the membership interests in Hal Fab.

The plain language of the February 9th agreement provides a clear promise by MacroTrend to reimburse appellees for "all" the expenses listed therein.

{¶ 24} Jordan nevertheless argues the February 9th letter must be read in conjunction with the February 7th letter to determine the parties' intent because the February 9th letter expressly states that it "confirms the prior statements and commitment of MacroTrend." The February 7th letter states that because MacroTrend had not yet received funding for the WhiteRock project, "it seems prudent for the parties to extend the contract for one month * * * ." Jordan contends

that when the February 7th and the February 9th letters (the "February letters") are read together, the promise to reimburse appellees' expenses in the February 9th letter only applies to one month of expenses. He also asserts that without the context provided by the February 7th letter, the plain language of the February 9th letter leads to an absurd result wherein MacroTrend is obligated to reimburse Hal Fab for all fees and expenses indefinitely into the future, even after MacroTrend was no longer involved in the WhiteRock project. (Appellant's reply brief p. 3.)

{¶ 25} When construing a contract, evidence of prior written agreements are generally barred from consideration by the parol evidence rule. "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27, 734 N.E.2d 782 (2000), quoting 11 Williston, *Contracts*, Section 33:4, at 569-570 (4th Ed.1999). *See also Carey v. Down River Specialties, Inc.*, 8th Dist. Cuyahoga No. 103595, 2016-Ohio-4864, ¶ 17-19.

{¶ 26} The parol evidence rule is not a rule of evidence, but a rule of substantive contract law employed as an aid to judicial interpretation. *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St.3d 433, 439, 662 N.E.2d 1074 (1996). As a policy matter, the rule is designed to protect the integrity of written agreements and thereby encourage parties to put all contractual terms in writing. *Galmish* at 27.

{¶ 27} However, when the circumstances surrounding the alleged agreement invest the language of the contract with a special meaning, extrinsic evidence may be considered in an effort to give effect to the parties' intentions. *Bellman v. Am. Internatl. Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, 865 N.E.2d 853, ¶ 7. *See also Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992) (Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning.).

{¶ 28} At the time the February letters were written, there was a common expectation among the parties that MacroTrend would receive the funds promised for WhiteRock's project in the very near future. (Tr. 406.) It was for this reason that Jordan indicated the need for a one-month extension in the February 7th letter. Indeed, the February 7th letter states that "MacroTrend expects to close soon[.]" Jordan testified he thought the February letters had to be considered together in order to understand the parties' intentions. He testified at trial:

> I didn't see either one as a guaranty. I saw the letter of the 9th to be read in conjunction with the one from February 7th. I thought that if there was a meeting of the minds, that a contract would then be drawn memorializing whatever was agreed to. And I thought that the February 9th letter was specific to a 30-day period to be somewhat lined up with the timeliness of the escrow agreement that was in place, running into March.

(Tr. 328.) Jordan also stated:

> At the lunch at the first part of February, it was discussed getting a 30-day extension, and this letter was to cover that. It was a 30-day concept. It was the value of 15, about $15,000 would probably be

involved to extend it with Arconic. But the idea was that I would accompany any meeting that was going on at Arconic so I could understand what the terms of the extension might be and I would be able to tell our team, this makes sense to me, or it's too expensive, or are we sure there's not an alternative buyer for this project and it needs to be extended at all, or should we just sort of walk away from it and take our chances upon funding, because the property would still be there.

(Tr. 410.) The February 7th letter corroborates his testimony. It states, in relevant part:

While MacroTrend expects to close soon, we are not yet able to confirm a date until the funds are transferred to our account. Therefore, it seems prudent for the parties to extend the contract for one month so this closing process takes place in an orderly manner. If agreeable with Arconic, I would be happy to come to Pittsburgh Thursday or Friday to meet them and answer any questions.

{¶ 29} Lichtig admitted at trial that he continued seeking extensions of the original purchase agreement and that he kept agreeing to pay the extension fees long after he ceased to have contact with MacroTrend because WhiteRock asked him to keep the deal open. (Tr. 94, 137.) Meyer also testified that after WhiteRock ended its relationship with MacroTrend in March 2018, WhiteRock continued to search for funding and he knew that Lichtig was continuing to seek extensions in late 2018. (Tr. 257-258.)

{¶ 30} It is unreasonable to find that MacroTrend agreed to reimburse appellees for all expenses, including those generated indefinitely into the future. The February 7th letter explains the circumstances surrounding MacroTrend's promise to reimburse appellees' expenses. It qualifies the term "all" in the February 9th agreement by limiting the time period for reimbursement to one month. When

the February letters are read together, it is clear that any reimbursement of all expenses listed in the February 9th letter was limited to a period of one month.

{¶ 31} However, there are other issues with the February letters. The February 9th letter does not state any consideration given by appellees in exchange for MacroTrend's commitment to reimburse their expenses. Consideration is the promise of one party to do something he or she is not obligated to do in exchange for another party's promise to do something in exchange. *Sal's Heating & Cooling v. Harbour View Assocs.*, 8th Dist. Cuyahoga No. 112490, 2023-Ohio-3632, ¶ 12; *Mooney v. Green*, 4 Ohio App.3d 175, 446 N.E.2d 1135 (12th Dist.1982) (consideration may be either a detriment to the promisee or a benefit to the promisor). To constitute consideration, the benefit or detriment must be "bargained for." *Sal's Heating & Cooling* at ¶ 12, citing *Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 283, 704 N.E.2d 39 (9th Dist.1997).

{¶ 32} The trial court found that "Defendants received consideration in the form of the benefit to the promisors because Defendants Jordan and Lustig testified [MacroTrend] and Defendants Jordan and Lustig would have earned large sums of money if Plaintiffs closed the transaction to purchase the Property and WhiteRock began operating the Plant." (Opinion and order, June 21, 2022, p. 8.) However, MacroTrend, Lustig, and Jordan would have received these benefits regardless of whether appellees purchased the Kentucky property and regardless of whether appellees obtained any additional extensions of the original purchase agreement if MacroTrend funded the WhiteRock project. WhiteRock and MacroTrend wanted to

purchase the property themselves and would have profited more if the deal had gone through and Hal Fab were no longer involved. (Tr. 414.) The promise of large profits if the WhiteRock project went forward was not a benefit given by appellees in exchange for appellees' obtaining any extensions of the original purchase agreement.

{¶ 33} Jordan testified that nothing was offered to MacroTrend in exchange for the reimbursement, and appellees presented no evidence to the contrary. (Tr. 329.) When the February letters are considered together and with the parties' trial testimony, it is clear there was no meeting of minds. Jordan believed there would be only one extension. The document does not specify if Lichtig believed there were any limitations with respect to time or number of extensions, but his actions indicate he thought there were none. The February 7th letter also suggests that the parties would not reach an agreement unless and until Arconic approved their plan for another extension. The February 9th letter is, therefore, not an enforceable contract.

{¶ 34} Therefore, the first and third assignments of error are sustained.

## B. Piercing the Corporate Veil

{¶ 35} In the second assignment of error, Jordan argues the trial court erred in piercing the corporate veil and in finding him personally liable for appellees' claims. He maintains there is no evidence that he was an officer of MacroTrend and that there was no basis to justify piercing the corporate veil.

{¶ 36} Shareholders, officers, and directors of a corporation are generally not liable for the debts of the corporation. *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d

506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 16 citing Article XIII, Section 3, Ohio Constitution; *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993). The corporate form was created, in part, to separate the corporate debts and property of the company from that of the stockholders in their individual capacities. *Id.* However, the corporate form may be disregarded in cases where the corporate shareholders commit fraud or in other exceptional circumstances. *Dombrowski* at ¶ 26.

> "The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."

*Dombrowski* at ¶ 18, quoting *Belvedere*, at paragraph three of the syllabus. These requirements are independent and written in the conjunctive; therefore, all three must be clearly established in order to be entitled to relief. *Id.*

{¶ 37} MacroTrend hired Jordan as its president pursuant to an employment agreement. In its description of Jordan's duties, the employment agreement states, in relevant part:

> As President, Employee shall oversee and direct the general business operations of the Company and perform such other necessary work in connection with the business as may be required of him *subject to the general direction, approval and control of the CEO and Chairman of the Board.*

(Emphasis added.) (Defendant's exhibit No. RJ 1.) Thus, despite his title as president, Jordan was not an officer of MacroTrend. (Tr. 381.) Jordan's sole

responsibility at MacroTrend was to source investment opportunities and bring them to the CEO and chairman of the board. (Tr. 381-382.) If MacroTrend successfully closed on a deal with any of these opportunities, Jordan would have been responsible for running the businesses on a day-to-day basis. (Tr. 383.) Jordan was not involved in securing investment funding for MacroTrend. (Tr. 381-382, 387.) He also had no authority to bind MacroTrend to any agreements or to take action without the express approval of Kevin Gluckstal ("Gluckstal"), MacroTrend's CEO. (Tr. 340, 353, 357-358, 381.) Moreover, Jordan had no ownership interest in the corporation and was not a member of the board of directors. (Tr. 381.) He, therefore, lacked any control over the corporation, and there is no evidence in the record to satisfy the first prong of the *Belvedere* test.

{¶ 38} There is also no evidence that Jordan committed fraud. To establish fraud, the plaintiff must demonstrate (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987); *Mobley v. James*, 8th Dist. Cuyahoga No. 108470, 2020-Ohio-380, ¶ 32.

{¶ 39} Jordan repeatedly assured Lichtig that MacroTrend would obtain the necessary funding for the WhiteRock project, which would have allowed Hal Fab to close on the purchase of the Kentucky property. The February 7th letter states: "At this point there is no question as to the funding and MacroTrend is committed to this project." Yet MacroTrend never obtained the necessary funding, and Jordan made representations that ultimately proved untrue. However, there is no evidence that Jordan knowingly or recklessly misrepresented MacroTrend's ability to procure the funding.

{¶ 40} When asked if there was any point in time where Meyer thought that Jordan was not being truthful about MacroTrend's ability to secure the funding, he replied: "I thought he was being truthful *with what he knew*[.]" (Emphasis added.) (Tr. 262.) Meyer never thought that Jordan misled him in any way. (Tr. 216.) Meyer testified that he, himself, was confident that MacroTrend would obtain the necessary funding. (Tr. 230-231, 241, 253.) Lustig also indicated he believed the funds were coming. (Tr. 337.) He interpreted the phrase "there is no question as to funding" to mean there is no question that the project was going to be funded; there was only a question as to when it would be funded. (Tr. 337.)

{¶ 41} Gluckstal was handling the procurement of funds from Indonesian/Vietnamese investors in Asia. (Tr. 267.) Jordan made representations to appellees based on the information being provided to him by Gluckstal. When Jordan was asked whether he had any cause to believe that Gluckstal was supplying him with inaccurate information regarding the status of the funding, he replied, "No.

No, not at all." (Tr. 387.) MacroTrend had agreements with investors in Indonesia and Vietnam, and Gluckstal was creating trusts in Switzerland to be used to transfer the funds from Asia, through Europe, to the United States. (Tr. 384-385.) Jordan believed that MacroTrend was going to be able to provide the funding. (Tr. 395, 404.) He testified: "I believed wholeheartedly the funding was coming." (Tr. 406.) Indeed, Jordan agreed, as stated in his employment agreement, that his compensation from MacroTrend would be contingent on him closing a deal with WhiteRock. If WhiteRock and MacroTrend had closed on their agreement, Jordan would have received a signing bonus, a salary of $350,000 to be paid retroactively to his start date with MacroTrend, plus 20 percent of the net transaction fees that would be owed to MacroTrend. (Tr. 383-384.)

{¶ 42} Jordan also met with an accounting firm to discuss tax planning because he anticipated receiving a large sum of money when the funding became available and MacroTrend paid him for his work. (Tr. 401.) Jordan's actions corroborate his testimony that he believed the funds were forthcoming. There is also no apparent motive for him to lie about the funding since he did not stand to gain anything by doing so. Ultimately the funds were never produced and Jordan was not compensated for the work he performed on behalf of MacroTrend. There simply is no evidence in the record to substantiate appellees' claim that Jordan knowingly or recklessly made false statements about the funding. Therefore, the trial court erred in piercing the corporate veil.

{¶ 43} The second assignment of error is sustained.

## C. Promissory Estoppel

{¶ 44} In the sixth assignment of error, Jordan reiterates his argument that the trial court erred in denying his motions for summary judgment and for directed verdict on appellees' claims for fraud, piercing the corporate veil, breach of contract, and promissory estoppel. In the fourth assignment of error, Jordan argues the trial court erred in failing to grant his motion for directed verdict, notwithstanding judgment. Because the fourth assignment of error is duplicative of the sixth assignment of error, we address them together.

{¶ 45} We have previously determined there is no evidence to support appellees' breach of contract and fraud claims and that there was no basis on which to pierce the corporate veil. And, having determined that appellees cannot pierce the corporate veil, appellees' promissory-estoppel claim against Jordan is moot. Appellees already obtained a default judgment against MacroTrend for damages caused as a result of appellees' reliance on the February 9th letter, and Jordan cannot be held personally liable for MacroTrend's debt. Therefore, the fourth and sixth assignments of error are overruled.

## D. Attorney Fees

{¶ 46} In the fifth assignment of error, Jordan argues the trial court erred in awarding appellees attorney fees based on exhibits withdrawn from trial and awarding breach-of-contract-claim damages for tort-based fraud claims.

{¶ 47} The trial court's decisions did not explain its reasons for awarding a total of $157,039.66 in attorney fees.[2] Under the "American rule," a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation. *Cruz v. English Nanny & Governess School*, 169 Ohio St.3d 716, 2022-Ohio-3586, 207 N.E.3d 742, ¶ 35. There are three "well-established exceptions" to this rule: (1) when a statute creates a duty to pay attorney fees, (2) when the losing party acted in bad faith, and (3) when the parties contracted to shift the fees. *Id.* at ¶ 36. Appellees' claim for attorney fees was based on their belief that MacroTrend's commitment to reimburse "all" expenses in the February 9, 2018 letter included attorney fees. They claim that the February 9, 2018 letter shifted the fees to MacroTrend and Jordan.

{¶ 48} However, since we have determined that the February 9, 2018 letter is not an enforceable contract and Jordan cannot be held personally liable for MacroTrend's debts because there is no basis for piercing the corporate veil, we find that the trial court erred in awarding a judgment for attorney fees against Jordan in his individual capacity.

{¶ 49} The fifth assignment of error is sustained.

{¶ 50} The trial court's judgments, journalized on June 21, 2022, and February 27, 2023, are reversed. Case remanded to the trial court to enter judgment in favor of Jordan on all claims.

It is ordered that appellant recover from appellees costs herein taxed.

---

[2] The trial court awarded $127,688.34 in its judgment following the bench trial and an additional award of $29,351.32 after a hearing on attorney fees for a total of $157,039.66.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., CONCURS;
LISA B. FORBES, J., CONCURS IN JUDGMENT ONLY